Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 20, 2004        Decided July 20, 2004

No. 03-3087

UNITED STATES OF AMERICA,
APPELLEE

v.

ARNETT C. SMITH,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 99cr00370-01)

———

*Charles B. Klein* argued the cause and filed the briefs for appellant.

*David B. Goodhand*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, *John R. Fisher*, *Barbara J. Valliere*, and *Mark H. Dubester*, Assistant U.S. Attorneys.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: ROGERS, GARLAND, and ROBERTS, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: In this case, which is before this court for a second time, appellant Arnett C. Smith raises several challenges to the district court's recalculation of his sentence for conspiracy and conflict of interest. The district court enhanced Smith's offense level by six levels under the Sentencing Guidelines, finding that Smith committed perjury during the trial, that his offense involved vulnerable victims, and that he had played a leadership role in the offense. The court also departed upward an additional two levels, relying on the fact that Smith's conduct included loan fraud for which he was not charged. Smith challenges all the enhancements and the upward departure. We affirm the sentence.

## I.

The facts are set forth in detail in *United States v. Smith*, 267 F.3d 1154 (D.C. Cir. 2001) (*Smith I*); we recount only those pertinent to this appeal. Smith was the chief of the Day Programs Branch of the District of Columbia's Mental Retardation and Developmentally Disabled Administration (MRDDA). His job included referring patients to treatment centers; one of the centers that regularly received such referrals was known as Better Treatment Centers (BTC). BTC's parent company, Psychological Development Associates, Inc. (PDA), was owned by Denise Braxtonbrown–Smith (no relation to appellant). The conflicts of interest for which Smith was convicted arise from several financial transactions among Smith, Braxtonbrown–Smith, and PDA.

First, in the fall of 1994, Smith set about purchasing a house on Columbia Road in the District of Columbia. Braxtonbrown–Smith rented the house from its elderly owner, Earnestine Keaton, and had an option to buy it. Braxtonbrown–Smith told Keaton that she could not afford to buy the house, but that her friend Smith could buy it at the current price of $85,000. Smith and Keaton signed a contract in October 1994 under which Smith was obligated to pay a total of $65,000; Braxtonbrown–Smith told Keaton (who was not

represented by a lawyer; Braxtonbrown–Smith had assured her that no lawyer was necessary because they were friends) that she would pay the remaining $20,000.

Smith, however, had no intention of being the record owner of the property. Even prior to his contract with Keaton, he arranged for his childhood friend Terry Reid to purchase the house. Reid submitted a mortgage application in September 1994; to facilitate the approval of the loan, he stated on the application that he would be occupying the house on Columbia Road as his principal residence. To make that statement more plausible, Smith drew up a fake lease that provided for Smith's mother, Florence Ricks, to move into Reid's current home in Upper Marlboro, Maryland. The mortgage was approved and Reid bought the house on Columbia Road from Smith in December 1994 for $102,000 — providing substantial profit to Smith, who at that time had paid only $10,000 toward the $65,000 that he owed to Keaton. The following month, Smith paid Keaton another $10,000; he paid the remaining $45,000 in April 1995, but only after Keaton contacted him when she learned from a newspaper about the sale of the property to Reid.

Braxtonbrown–Smith was now nominally Reid's tenant, but Smith retained a significant role in the affairs relating to the house. He oversaw the preparation of a lease that Braxtonbrown–Smith and Reid signed, under which Braxtonbrown–Smith agreed to pay roughly $1,300 per month in rent. He and Reid also entered into their own agreement — again prepared at Smith's direction — which provided that Reid would record the deed to the property solely in his name. The same agreement, however, established that Smith and Reid would in fact own the property as tenants in common, each with a fifty percent share. Reid and Smith thus executed a new deed reflecting their tenancy in common; by the express terms of the agreement, this new deed was to remain unrecorded. Smith and Reid took equal shares of the profit — roughly $200 per month — that was earned from renting the home to Braxtonbrown–Smith.

The second series of transactions involved in this case were short-term loans from Smith to PDA. In January 1995,

Smith lent $14,900 to PDA and received, just one week later, a repayment of $18,500. Two additional loans from Smith to PDA, in late January and March 1995, totaled $28,000, for which Smith received a repayment of $39,000 from PDA in early April 1995.

Smith was charged with three counts of receiving illegal gratuities under 18 U.S.C. § 201(c)(1)(B), two counts of conflict of interest under 18 U.S.C. § 208(a), and one count of conspiracy under 18 U.S.C. § 371. The conspiracy charge identified three possible predicate offenses: payment of illegal gratuities (a violation of 18 U.S.C. § 201(c)(1)(A)), receipt of illegal gratuities, and conflict of interest. The jury deadlocked on the first three counts — the charges of receipt of illegal gratuities — but convicted Smith on the conflict of interest and conspiracy counts. The verdict left one issue, which would be relevant at Smith's sentencing, unresolved: it failed to identify which of the three possible predicate offenses identified in the indictment was the offense underlying the conspiracy conviction. At sentencing, the district court resolved the issue, determining that "the evidence proven by a preponderance at trial amply demonstrate[d] that [Smith] conspired to commit the offense of Receipt of Illegal Gratuities and/or Payment of Illegal Gratuities." *United States v. Smith*, No. 99-CR-370, mem. op. at 4 (D.D.C. Nov. 6, 2000) (Initial Sentencing Op.). The court added several enhancements to the base sentencing level for that assumed predicate offense, relying on the number and value of the gratuities and the fact that the conspiracy involved a vulnerable victim. *See* 2002 U.S.S.G. §§ 2C1.2(b)(1) (multiple gratuities), 2C1.2(b)(2)(A) (value of gratuities), 3A1.1(b)(1) (vulnerable victim). Further enhancements were warranted, the court found, because Smith was the organizer of the conspiracy and had committed perjury at his trial. *See id.* §§ 3B1.1(c) (aggravating role), 3C1.1 (obstruction of justice).

After adding these enhancements, the court turned its attention to a government motion for an upward departure under Section 5K2.0 of the Guidelines. The government emphasized that certain conduct related to Smith's conspiracy offense — "efforts to evade income taxes, commit bank fraud

and defraud Mrs. Keaton" — were not accounted for in the sentencing guidelines applicable to the conspiracy charge. Initial Sentencing Op. at 20–21. The court adopted the government's reasoning and departed upward. *Id.* at 24. In exercising its discretion as to the extent of this departure, the court examined how many levels would be added to Smith's sentence — under the grouping rules of Section 3D of the Guidelines — if he had actually been convicted of all three additional offenses (tax evasion, bank fraud, and fraud on Mrs. Keaton). Concluding that a hypothetical conviction on these offenses, with certain enhancements — including an enhancement for perjury relating to the bank fraud — would warrant a three-level increase in Smith's offense level, the court chose to depart upward to that extent. *Id.* at 24–25. The foregoing calculations yielded a guideline range of 41 to 51 months' imprisonment, and the court sentenced Smith to a 46-month prison term.

Smith appealed, and we affirmed his conviction but vacated his sentence and remanded for resentencing. *Smith I*, 267 F.3d at 1163. As an initial matter, we concluded that the court had erred by using a preponderance-of-the-evidence standard, instead of requiring proof beyond a reasonable doubt, in determining that payment/receipt of illegal gratuities was the predicate offense implicit in the conspiracy conviction. *Id.* at 1161–63. With respect to the upward departure, we approved of the district court's methodology for determining the extent of the departure, but found that two of the three uncharged offenses on which the court had relied — tax evasion and fraud on Mrs. Keaton — should not have been used in the calculation. *Id.* at 1165–66. As for the third uncharged offense — the loan fraud — we held that "the court's conclusions . . . [were] well supported by the record," but found that the court's decision to add an enhancement for perjury in its calculation of the adjusted offense level for that hypothetical offense may have been improper because the court "may have confused lying to the bank . . . with lying to the court." *Id.* at 1166.

On remand, the district court concluded that a conflict of interest offense, rather than a gratuities offense, was the

predicate offense for the conspiracy of which Smith was convicted. *United States v. Smith*, No. 99-CR-370, mem. op. at 2–3 (D.D.C. June 23, 2003) (Resentencing Op.). The court noted that the base offense level for that offense was six, *see* 2002 U.S.S.G. § 2C1.3, and reached a total offense level of twelve by adding most of the same enhancements it had applied in the initial sentencing: two levels for Smith's perjury at trial, two levels under the vulnerable victim provision, and two levels for Smith's role as an organizer. Resentencing Op. at 3–4. In adopting the last two enhancements, the court stated that "the Court of Appeals failed to find that these adjustments were unwarranted or unsupported by the record, and therefore the adjustments are not before the Court on remand." *Id.* The court elaborated, however, that "[w]hile the object offense of the conspiracy has changed, the facts supporting the two adjustments have not." *Id.* at 4.

The court again opted to depart upward, although the government had not requested an upward departure during the resentencing. Heeding this court's conclusions in *Smith I*, the district court focused only on the uncharged bank fraud in calculating the extent of the upward departure, and clarified that the perjury enhancement on that hypothetical charge stemmed from false statements that Smith made at trial, not the statements he made to the bank. *Id.* at 3, 10. Concluding that the uncharged bank fraud — with enhancements for more than minimal planning, Smith's role in the offense, and Smith's perjury at trial — would have yielded a two-level upward adjustment under the Sentencing Guidelines' grouping rules, the court chose to use that same number of levels for its discretionary upward departure under Section 5K2.0. Smith was sentenced to 21 months in prison and appealed again.

## II.

### A. Applicable Sentencing Guidelines

As a threshold matter, we address Smith's contention that the 1995 version of the Sentencing Guidelines, rather than the

2002 version in effect at the time of Smith's resentencing, must be used to avoid an *ex post facto* problem. *See* 2002 U.S.S.G. § 1B1.11(b)(1) ("If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date [of] the offense of conviction"). He points to two amendments made in the Guidelines after 1995.

First, in November 1997, the Application Notes to Section 3C1.1 were amended to change the standard of proof for applying a perjury enhancement: language requiring that evidence of alleged perjury "should be evaluated in a light most favorable to the defendant" was removed and replaced with an admonition for courts to "be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory." U.S.S.G. app. C, amend. 566. This court construed the amendment to mean that while proof of perjury by clear and convincing evidence had formerly been required, such allegations could now be proven by a preponderance of the evidence. *See United States v. McCoy*, 242 F.3d 399, 407 n.14 (D.C. Cir. 2001) (citing *United States v. Dozier*, 162 F.3d 120, 124 n.1 (D.C. Cir. 1998)). Second, in November 1998, Section 3C1.1 and its Application Notes were both amended to clarify that the enhancement could be applied if the perjury "related to . . . the defendant's offense of conviction *and any relevant conduct*." U.S.S.G. app. C, amend. 581 (emphasis added). Prior to that amendment, this court had held that an enhancement for perjury could apply only for perjury relating to the offense of conviction itself. *United States v. Barry*, 938 F.2d 1327, 1333 (D.C. Cir. 1991).

Nowhere, however, does Smith show how these amendments actually disadvantage him — a showing that he is required to make: "For purposes of *ex post facto* analysis, the question is whether, if applied retroactively, the amendment would effect any pertinent substantive change that disadvantages the defendant." *United States v. Clark*, 8 F.3d 839, 844 (D.C. Cir. 1993); *see also United States v. Harris*, 41 F.3d 1121, 1123 (7th Cir. 1994) (no *ex post facto* violation because

defendant "failed to show that he suffered any detriment as a result of the district court's application of the Guidelines which were in effect at the time of sentencing"). The district court adopted the stricter evidentiary standard for its perjury determination, so Smith was not prejudiced by the November 1997 change. Resentencing Op. at 11 ("Perjury must be found by clear and convincing evidence.") (citing *United States v. Montague*, 40 F.3d 1251, 1254 (D.C. Cir. 1994)). Similarly, the perjury finding that we affirm herein relates solely to Smith's offense of conviction, and thus would be justified under either set of Guidelines. We therefore conclude that the outcome of this case would be the same whichever set of Guidelines is used. That being so, no *ex post facto* problem arises from applying the 2002 Guidelines, and there is no basis to depart from the default rule that the Guidelines in effect at the time of sentencing should apply. *See* 2002 U.S.S.G. § 1B1.11(a).

## B. Perjury Enhancement

Under *United States v. Dunnigan*, 507 U.S. 87, 94 (1993), an enhancement for perjury at trial under Section 3C1.1 of the Guidelines can be imposed only if the district court finds that the defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." The district court held that on three occasions during the trial, Smith gave testimony that satisfied the requirements of falsity, materiality, and willfulness.

The first was during Smith's testimony about the fake lease that he created to help Reid win approval for the mortgage on the Columbia Road house. Smith "testified that his mother was completely unaware that her name was being bandied about . . . as a purported lessee of Reid's Upper Marlboro home," Resentencing Op. at 11, but he also testified as follows:

> Q: And you were actually going to move [your mother] into [Reid's home] if necessary?
>
> A: Well, the truth of the matter is that was a possibility because her house needs to be rehabed [sic]. We've

talked about it a number of times, and I think I probably could have convinced her to do that at that time.

Trial Tr. (May 10, 2000), at 146. The district court ruled that this testimony was false, noting that it was "unclear who the 'we' in that sentence is: it could not have been his mother, . . . and it could not have been Reid, who testified that he did not know who Florence Ricks was or if she even existed when the lease was executed." Resentencing Op. at 12. The court also found that the testimony was "material . . . because it went to defendant's credibility" and that it was willful, noting that all three *Dunnigan* factors were satisfied by clear and convincing evidence. *Id.* at 12, 14.

Although the district court found that this first instance of perjury was "entirely adequate" to support the two-level enhancement that it imposed under Section 3C1.1, it held that Smith had committed perjury on two other occasions. *Id.* at 14–15. One of those instances was Smith's testimony about steps he took to help provide interim office space for BTC in a District of Columbia government building while BTC was awaiting approval for a new permanent location. As the district court noted, Smith initially "testified that he probably was not in town at the time this happened, and might not have spoken to his staff about the issue." *Id.* at 14 (citing Trial Tr. (May 11, 2000), at 37–38). Subsequently, when confronted with evidence that he had signed a check on the day of BTC's move to the interim space, Smith admitted that he had not been out of town, *see* Trial Tr. (May 11, 2000), at 40; the district court concluded that Smith's initial testimony was false, material, and willful. Resentencing Op. at 14.

The final instance of testimony that the court deemed perjurious was Smith's explanation of a check for $1415.95 that included the notation "XMAS — Disney." The evidence at trial showed that when Reid purchased the house in December 1994, Smith gave a cashier's check to a title company in the amount of $9405.95. According to the records of the bank that issued the cashier's check, the funds came from an $8000 check drawn on Smith's own credit union

account and a $1415.95 check from a company Smith owned called SAGA Adventures (reduced by a $5.00 cash withdrawal and a $5.00 service charge). On the witness stand, Smith insisted that the SAGA Adventures check — which bore the Disney notation — was used to pay for "a Disney excursion that left Washington taking some disabled folks." Trial Tr. (May 10, 2000), at 152. The district court concluded that this testimony was "false and disproved by the documentary evidence," as well as material and not the result of confusion or faulty memory. Resentencing Op. at 15.

Smith argues that the court erred in finding perjury in these three instances because, in each instance, none of the *Dunnigan* requirements was satisfied. We review sentencing decisions under a now-familiar trichotomy: "purely legal questions are reviewed *de novo*; factual findings are to be affirmed unless 'clearly erroneous'; and we . . . give 'due deference' to the district court's application of the guidelines to [the] facts." *United States v. Kim*, 23 F.3d 513, 517 (D.C. Cir. 1994).

We affirm the two-level enhancement for Smith's perjury, based on his testimony regarding the purported Disney check. The district court did not clearly err in finding by clear and convincing evidence that Smith's testimony about the check was false: the documentary evidence demonstrated the origins of the $9405.95 check to the title company with so much precision that there was no error in refusing to credit Smith's insistence that the money was instead used for a trip to Disney World. Indeed, although Smith made passing reference in his testimony to documents in his possession that would confirm the Disney story, *see* Trial Tr. (May 10, 2000), at 152, it appears that no such documents were ever entered into evidence during trial. On appeal, Smith points only to the fact that SAGA Adventures was, in general, a company that "organized excursions to places such as Disney World on behalf of disabled individuals," Appellant's Br. at 22; that general observation does not explain away the fact that the check used to purchase the title-company check was for an amount identical to the amount of the particular SAGA check that was the focus of Smith's testimony.

The SAGA check was clearly material to the charge of conspiracy to commit a conflict of interest, because the truth or falsity of the Disney notation shed light on whether Smith took steps to hide his role in the purchase of the house where Braxtonbrown–Smith lived — that is, on Smith's alleged criminal intent. Finally, the testimony was clearly willful: Smith had several opportunities to clarify or retreat from his stance that the money was used for a Disney excursion, but he steadfastly refused to do so. In response to a specific question about whether he used the SAGA check to purchase the title check, Smith answered, "No, I did not do that." Trial Tr. (May 10, 2000), at 152; *see also id.* ("That check is in reference to a Disney excursion that left Washington taking some disabled folks."). The prosecution pursued the issue further, emphasizing in detail the correlation between the amount of the alleged Disney check and the subsequent cashier's check to the title company and asking, "[Do] you dispute that that $1,400 check on the screen in front of you was used as part . . . of this cashier's check?" *Id.* at 153. Smith answered, "I dispute the fact that you're saying that I used this check. I'm saying . . . the cash that was used out of this check was for a trip to Disney." *Id.* And when asked pointedly whether the Disney notation was on the check to hide his involvement in buying the house, Smith said "No, sir." *Id.*

Smith argues that because, at one point during this testimony, he uttered the phrase, "[I]f my memory serves me correct," *id.* at 152, each of the statements regarding the SAGA check was simply a result of faulty memory — and therefore, under the express terms of *Dunnigan*, not willful. In context, however, Smith's reference to his possibly faulty memory pertained not to the SAGA check at all, but rather to the $8000 personal check that accounted for the other portion of the $9405.95 cashier's check. *Id.* ("I did get $8000 out of my credit union account, and if my memory serves me correct, and my files are over there, I do have receipts to support that."). Even if his offhand reference to his memory could be read to qualify the *first* of his statements that the SAGA check was used for an innocuous Disney excursion, it

would not undercut the several *subsequent* statements about the SAGA check, which were increasingly definitive — unadorned by caveats or qualifications.

## C.  Vulnerable Victim Enhancement

The district court based its two-level enhancement for vulnerable victims on a finding that "Smith exploited and used his power over mentally retarded adults to realize personal financial gains to their detriment."  Initial Sentencing Op. at 15; *see also* Resentencing Op. at 4 (court adopts the initial opinion's factual and legal support for vulnerable victim and role in the offense enhancements).[1]  We affirm the enhancement.

The district court did not clearly err in finding that Smith's MRDDA clients were harmed when he referred them to BTC: the testimony of several witnesses indicated that the treatment of patients at BTC was substandard.  Jacquelin Smith, an MRDDA employee (no relation to appellant), testified about a negative report that she wrote after a May 1994 visit to BTC, cataloging numerous deficiencies in the program's record-keeping and activities.  Trial Tr. (May 4, 2000), at 113–17.  Ms. Smith's report concluded with the "overall impression" that BTC was "not meeting the individual needs of the customers."  *Id.* at 116.  On the stand, Ms. Smith stated that she could not recall ever having written a report so critical of a day program.  *Id.* at 117.  A former BTC

---

[1] The district court initially suggested that the vulnerable victim and role in the offense enhancements were "not before [it] on remand" because our opinion in *Smith I* did not address either of those enhancements.  Resentencing Op. at 3–4.  Ultimately, however, the district court did not simply rest on its assumption that these enhancements were off-limits.  Rather, the court explained why the enhancements applied to the conflict of interest charges, stating that "[w]hile the object offense of the conspiracy has changed, the facts supporting the two adjustments have not.  Nor does the change in the predicate offense affect the Guidelines provisions."  *Id.* at 4.  We conclude that the district court gave due consideration to the applicability of the enhancements to the changed predicate offense.

employee named Juanita Cook, who had begun work at the company more than six months after Ms. Smith's report, testified that the staff was "minimal" and that many of the staff members "were not trained to work with developmental[ly] disabled clients." Trial Tr. (May 8, 2000), at 60. She added that BTC "didn't have appropriate materials and supplies to work with the clients," and that "[t]he documentations and records were not in very good shape." *Id.*

We further agree with the district court that these harmful referrals are "relevant conduct" for appellant Smith's conflict of interest offense, and that the requirements for an enhancement under Section 3A1.1 of the Guidelines are satisfied. That section states, in pertinent part, that a vulnerable victim is "a victim of the offense of conviction and any [relevant conduct] . . . who is unusually vulnerable due to . . . mental condition, or who is otherwise particularly susceptible to the criminal conduct." 2002 U.S.S.G. § 3A1.1 App. Note 2; *see also* 1995 U.S.S.G. § 3A1.1(b) (enhancement applies when "a victim of the offense was unusually vulnerable due to . . . mental condition, or . . . otherwise particularly susceptible to the criminal conduct").[2] There is little doubt that MRDDA

---

[2] Smith emphasizes that the 1995 Guidelines mention only the offense, thus suggesting that relevant conduct is not a basis for the Section 3A1.1 enhancement under that version of the Guidelines. *See* Reply Br. at 12. But this allegation of a discrepancy between the 1995 and 2002 versions of the Guidelines fails. The word "offense" in the 1995 Guidelines — indeed, in every version of the Guidelines — is a term of art defined to include relevant conduct. *See* 1995 U.S.S.G. § 1B1.1 App. Note 1(*l*) (" 'Offense' means the offense of conviction and all relevant conduct . . . unless a different meaning is specified or is otherwise clear from the context."). Section 3A1.1 was amended in 1997 to spell out what eight circuits had held the Guidelines already provided — that the word "offense" in that section included relevant conduct. *See* U.S.S.G. app. C, amend. 564; Thomas W. Hutchison et al., Federal Sentencing Law and Practice § 3A1.1, at 1155–56 & n.34 (2004) (listing cases). Only one circuit had disagreed, *see United States v. Wright*, 12 F.3d 70, 73–74 (6th Cir. 1993), and we had not decided the issue. Given this background, Smith cannot carry his burden of showing that the amendment changed the law to his disadvantage.

clients were vulnerable to Smith's conflict-laden referral scheme: due to their mental condition and the reliance that they placed on MRDDA, they were in no position to recognize that the treatment they received at BTC was substandard.

**D.  Role in the Offense Enhancement**

Smith argues that the two-level enhancement for his role as organizer or leader of the offense, under Section 3B1.1 of the Guidelines, was unwarranted.  Given the deference we accord to the district court's application of the Guidelines to the facts — we use a standard of review that is "somewhere between *de novo* and 'clearly erroneous,' . . . something akin to the review we give administrative agency determinations of such mixed questions," *Kim*, 23 F.3d at 517 — we affirm the enhancement.

Section 3B1.1 provides for a two-level enhancement if the defendant was "the organizer, leader, manager, or supervisor of one or more other participants."  2002 U.S.S.G. § 3B1.1 App. Note 2; *see also id.* § 3B1.1(c).  The district court based its decision to enhance on two principal findings: first, that Smith "directed Terry Reid in the submission of false representations to the mortgage lender," and second, that Smith had "superior bargaining power over Braxtonbrown–Smith."  Initial Sentencing Op. at 18.  From our deferential viewpoint, the court properly applied the enhancement for Smith's role in the scheme to hide his interest in the Columbia Road house (including the fraud on the bank in obtaining the mortgage) and his direction of Reid in carrying out that scheme.

The Sentencing Guidelines list a number of factors for a sentencing court to consider when deciding whether to apply an enhancement for a defendant's role as organizer or leader: they include

> the exercise of decisionmaking authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature

and scope of the illegal activity, and the degree of control and authority exercised over others.

2002 U.S.S.G. § 3B1.1 App. Note 4; *see also United States v. Kelley*, 36 F.3d 1118, 1129 (D.C. Cir. 1994). Reid's testimony showed that a number of these factors are present here. Smith recruited Reid to participate in the scheme: when Reid initially told Smith of his interest in purchasing rental property, Smith told him that purchasing the Columbia Road property "would be a . . . good investment . . . because [Braxtonbrown–Smith was] staying there." Trial Tr. (May 5, 2000), at 59. Smith exercised more decisionmaking authority than Reid, and was the driving force in planning and organizing the offense: when Reid applied for the mortgage, the decision to falsely state that Reid would be living in the house was "Mr. Smith's decision." *Id.* at 61. The side agreement that created the tenancy in common between Reid and Smith left it entirely up to Smith to record the corresponding deed at a time of his choosing. *Id.* at 75. Reid admitted that he did not fill out the mortgage application himself; it was "filled out for [him]," and Smith had handed it to him, so he "assumed that [Smith] probably had filled it out." Trial Tr. (May 8, 2000) at 11.

Smith's participation in the offense was also much more significant than Reid's. Reid in fact testified that he had "never seen" Braxtonbrown–Smith. *Id.* at 39. The fake lease between Reid and Ricks, designed to facilitate Reid's mortgage, was created by Smith. Trial Tr. (May 5, 2000), at 63, 94. After Reid became the record owner of the house, Smith presented him and Braxtownbrown–Smith with the agreement governing Braxtonbrown–Smith's continued tenancy. *Id.* at 73. When Braxtonbrown–Smith was behind in her rent — on a house nominally owned by Reid alone — it was nonetheless Smith who drafted correspondence and "presented it" to Reid for a signature. *Id.* at 82.

"All persons receiving an enhancement [under Section 3B1.1] must exercise some control over others," *United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998), and that requirement is satisfied in this case. When Reid was asked

why he indicated on the loan application that he would occupy the house on Columbia Road, he responded, "I was told I needed to check that box." Trial Tr. (May 8, 2000), at 34. And as Reid explained in response to a general question about the real estate deal near the end of his testimony, the house "means nothing to me . . . . [In] the process of flipping [the] house over . . . I just followed that instruction." *Id.* at 35; *see also id.* at 38 ("These terms were presented to me by [Smith]."). In light of the evidence, we cannot say that the district court's conclusion — that Smith was the organizer of the scheme and exercised sufficient control over Reid to warrant a sentence enhancement — exceeds the limits of our deference.

### E. Upward Departure

We turn finally to Smith's argument that the two-level upward departure under Section 5K2.0 of the Guidelines was improper. The government argues that Smith has waived any challenge to the court's authority to depart upward, and we agree. In his memorandum to the court during resentencing, Smith straightforwardly stated: "Though he does not believe that such is warranted, assuming the Government so moves, the Defendant recognizes the Court's ability to impose an upward departure pursuant to U.S.S.G. § 5K2.0 for loan fraud." Def.'s Mem. in Aid of Sentencing (Feb. 15, 2002), at 12. This concession was, as Smith points out, apparently contingent on a government motion for an upward departure, and the government chose not to file such a motion. Later in the same document, however, Smith stated unconditionally that "the Court may choose to depart upward." *Id.* at 14. This waiver of objections to the fact of departure may have been influenced by our decision in *Smith I*, which found the upward departure for the uncharged loan fraud "well supported by the record." 267 F.3d at 1166.

Having also approved, in *Smith I*, the district court's methodology for selecting the extent of the upward departure, we affirm the two-level upward departure that the court imposed at resentencing as within the district court's discretion. In doing so, we need not reach the issue of enhance-

ment for perjury in relation to the uncharged bank fraud; we instead affirm the two-level "enhancement" for more than minimal planning, which Smith does not contest, *see* Appellant's Br. at 24 n.12, and the two-level "enhancement" for Smith's role as an organizer or leader, for the reasons discussed above.[3]

* * *

The sentence imposed by the district court is affirmed.

---

[3] With the perjury enhancement for the uncharged bank fraud omitted, the district court's methodology for calculating the extent of the upward departure still yields a departure of two levels. As the district court found, a hypothetical conviction for the bank fraud would have constituted a separate "group" from the conspiracy and substantive conflict of interest offenses, for purposes of the Guidelines' grouping rules, because the bank fraud involved a different victim. Resentencing Op. at 17; *see* 2002 U.S.S.G. §§ 3D1.1, 3D1.2(a). In the district court's calculation, the offense level for the group containing the conspiracy and conflict of interest offenses was level twelve, and the hypothetical offense level for the group containing the bank fraud was also twelve. *See* Resentencing Op. at 16. Under our calculation, the offense level for the first group is level twelve, and the hypothetical offense level for the second group is ten (because we do not address the two-level enhancement for perjury in relation to the uncharged bank fraud). With one group at level twelve and a second group at level ten, each group constitutes one "unit" under the Guidelines. *See* 2002 U.S.S.G. § 3D1.4(a) (group with highest offense level constitutes one unit, and any other group up to four levels less serious counts as one additional unit). The same was true — that is, each group constituted a single unit — when the district court included a two-level perjury enhancement for the uncharged bank fraud; in other words, the two-level difference between the district court's calculation and our calculation does not alter the fact that the bank fraud constitutes a separate unit from the conflict of interest unit. *See id.* These two units, in turn, would yield an enhancement of two levels if the bank fraud were not merely hypothetical. *See id.* § 3D1.4. Under the district court's methodology, the upward departure under Section 5K2.0 of the Guidelines would thus be the same two levels.