# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 1, 2005       Decided February 10, 2006

No. 03-3156

UNITED STATES OF AMERICA,
APPELLEE

v.

ANTONIO N. TABRON, *A/K/A* FAT CAT,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cr00396-08)

———

*Jonathan S. Zucker*, appointed by the court, argued the cause and filed the brief for appellant.

*John P. Mannarino*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, *John R. Fisher*, Assistant U.S. Attorney at the time the brief was filed, and *Roy W. McLeese III* and *Stephen J. Pfleger*, Assistant U.S. Attorneys.

Before: RANDOLPH, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*:  Although appellant pled guilty to conspiracy to distribute marijuana, cocaine, and crack, he objected to a two-level sentencing enhancement based on the weapons possession of alleged co-conspirators.  The district court nonetheless imposed the two-level "gun bump" because it found that appellant must have known that other individuals with whom he had been indicted regularly used guns.  In doing so, however, the district court made no explicit finding as to the scope of appellant's conspiratorial agreement.  Because our case law requires such findings before defendants are held accountable for the conduct of alleged co-conspirators, we vacate the gun bump and remand for reconsideration.

**I.**

In November 2001, a grand jury indicted sixteen individuals, including appellant Antonio Tabron—also known as Fat Cat—charging them with various drug-related crimes.  A little more than a year later, Tabron pled guilty to conspiracy to sell illegal drugs and, in his proffer, accepted responsibility for the conspiracy's distribution of 1.5 kilograms of crack.

One individual charged in the indictment, Abdur Mahdi, declined to plead guilty and was eventually convicted of, among other things, first-degree murder, conspiracy to distribute drugs, and various racketeering offenses.  During Mahdi's lengthy trial, other charged individuals testified that Mahdi led a major drug gang that regularly used guns.  Several implicated Tabron as a member of the Mahdi gang, and one, Joseph Hooker, testified that Tabron had supplied an AK-47 to a gang member.

After Mahdi's trial and in preparation for Tabron's sentencing hearing, a parole officer prepared a presentence report concluding that, under the sentencing guidelines, Tabron should be incarcerated for between 262 and 327 months.  In making this calculation, the parole officer added two levels to

Tabron's base offense level because "a firearm[] was possessed" in the course of the conspiracy. U.S. Sentencing Guidelines Manual § 2D1.1(b)(1) (2000). Without this "gun bump," Tabron would have received between 210 and 262 months of prison time. As part of Tabron's plea agreement, however, the government asked the court to impose a sentence between 84 and 90 months, well below the guidelines' minimum.

Tabron's attorney objected to the presentence report, explaining that it "describe[s] generally the violent conduct of the co-defendants and involve[s] conduct in which Mr. Tabron played no role, was not charged and which cannot be attributed to him at sentencing." Presentence Investigation Report 21 (addendum). Although recognizing that the gun bump would "have no effect on" Tabron's length of imprisonment, defense counsel pointed out that Tabron's "security classification and designation by the Bureau of Prisons [would] likely [be] adversely affected" if the district court attributed the weapons possession to him. *Id*. at 22.

In response, the district court asked whether Tabron was attempting to disclaim responsibility for the Mahdi gang's rampant weapons possession. Tabron's counsel replied that while Tabron had participated in a conspiracy, he "contest[ed] whether or not the use of guns and violence was within the scope of his conspiratorial agreement and base[d] that on his lack of involvement in any of that." Sentencing Hr'g Tr. 14, Dec. 8, 2003. Tabron, his counsel insisted, was merely a fringe operator who, though aware of the Mahdi gang, had never joined it and had only conspired on the side to buy and sell drugs with Hooker, a member of the gang.

The government made two points in support of imposing the gun bump. First, it claimed that "when you got a large drug conspiracy . . . the Court . . . can make those individualized

findings for this defendant about the reasonable foreseeability of weapons." *Id.* at 10. Second, it pointed to Hooker's testimony that Tabron gave an AK-47 to a member of Mahdi's gang. The government concluded, "either under reasonable foreseeability or the testimony that puts a gun in his hands, we think the Court can impose the two points." *Id.*

Though recognizing that it could have avoided the issue entirely, *see* Fed. R. Crim. P. 32(i)(3)(B) (permitting a court to "determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing"), the district court rejected Tabron's argument. Even assuming that Tabron never possessed the AK-47, the court reasoned, he should have foreseen that his co-conspirators would have guns: "[I]t is hard to conceive of anyone not understanding what was going on out there as people were shooting at each other." Hr'g Tr. 17. The court therefore adopted the presentence report's findings in full and sentenced Tabron to 90 months in prison.

Because the gun bump renders Tabron ineligible for early release under Bureau of Prisons regulations, *see* 28 C.F.R. § 550.58(a)(1)(vi)(B), he now appeals the district court's adoption of the presentence report's findings with respect to the weapons enhancement.

## II.

At least until recently, "where . . . the relevant conduct issue involves not only a factual question, but the district court's application of the guidelines to the facts, the proper standard [of review] is due deference—one between clear error and *de novo* review." *United States v. Mellen*, 393 F.3d 175, 183 (D.C. Cir. 2004) (internal quotation marks omitted). Our cases, however, drew this standard from a provision of the sentencing guidelines that the Supreme Court excised from the Sentencing Act in

*United States v. Booker*, 125 S. Ct. 738, 764-65 (2005) (excising 18 U.S.C. § 3742(e)). Tabron urges us to heed *Booker*'s instruction to fill the gap left by the excision by applying a "reasonableness" standard. *Id*. at 765-68. For its part, the government contends that where, as here, the challenged district court decision has no effect on the length of a defendant's sentence, *Booker* leaves the pre-existing standard undisturbed.

We need not settle the matter here because Tabron's lone argument is that, in ascribing the weapons possession to him as relevant conduct, the district court erred as a matter of law. Whether we give due deference to the district court's decision (the statutory standard) or review it for reasonableness (the *Booker* standard), we may unquestionably set it aside if it rests on legal error. *See Mellen*, 393 F.3d at 186 (reversing on due deference review for legal error); *see also United States v. Doe*, 398 F.3d 1254, 1257 n.5 (10th Cir. 2005) ("Because we conclude that the district court erred as a matter of law . . . we need not address any further impact of *Booker* on appellate review.").

Turning to the merits of Tabron's appeal, we begin with "the well-settled principle of conspiracy law that someone who jointly undertakes a criminal activity with others is accountable for their reasonably foreseeable conduct in furtherance of the joint undertaking." *United States v. Saro*, 24 F.3d 283, 288 (D.C. Cir. 1994). In attributing co-conspirators' acts to a criminal defendant, however, district courts must take great care: as Judge Friendly observed, "[a]lthough it is usual and often necessary in conspiracy cases for the agreement to be proved by inference from acts, the gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant." *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964). To that end, we have established a "strict procedural mandate" that

requires district courts to make explicit findings as to the scope of a defendant's conspiratorial agreement before holding him responsible for a co-conspirator's reasonably foreseeable acts. *United States v. Childress*, 58 F.3d 693, 722 (D.C. Cir. 1995) (per curiam). Absolute conformity with this mandate is critical, else we risk holding defendants accountable for crimes committed in furtherance of conspiracies they never joined.

Tabron argues that "[t]he District Court's determination was unreasonable because it assumed that Mr. Tabron's agreement was coextensive with the conspiracy as a whole." Appellant's Br. 8. For support, Tabron relies on *United States v. Childress*, in which the district court had attributed the weapons possession of alleged co-conspirators to several defendants based solely on a finding that the co-conspirators' gun possession was reasonably foreseeable. *Childress*, 58 F.3d at 724-26. Because the district court had never made "individualized findings about whether the scope of each appellant's agreement encompassed the use of guns," however, we vacated the sentences. *Id*. at 726. According to Tabron, precisely the same thing happened here: instead of finding that Tabron participated in the broader conspiracy with Mahdi, the district court simply determined that the Mahdi gang's use of guns was reasonably foreseeable.

The government seeks to distinguish *Childress* on the ground that "the district court made specific findings as to the scope of [Tabron's] conspiratorial agreement." Appellee's Br. 14. Tellingly, however, the government points to nothing in the sentencing hearing to support this statement. Nor could it. Our own careful review of the transcript reveals that, as in *Childress*, the district court made no finding whatsoever with respect to the scope of Tabron's conspiratorial agreement. The court never even mentioned the phrase.

Instead, the district court concentrated on whether Tabron should have foreseen that members of the Mahdi gang would use guns in the course of their criminal enterprise. Consider two characteristic examples. In the first, the district court reasoned:

> I have certainly ample evidence to believe he was fully aware of this beef going on with [a rival] and what was happening with his co-conspirators and their use of weapons.
>
> . . . There is plenty before me to say that he . . . may not have wanted to use guns himself, but to say under relevant conduct that it was reasonably foreseeable with respect to the conspiracy he joined, these guys did nothing without guns.
>
> It was a constant activity. . . . [I]t would sort of stretch credulity to say he was in this conspiracy and he really . . . couldn't reasonably foresee the use of the guns in the conspiracy that he was a part of is a little bit difficult to accept.

Hr'g Tr. 13-14. Likewise, explaining its adoption of the allegedly objectionable portions of the presentence report, the court stated:

> [Tabron] was . . . frequently involved in many drug sales, and he was the person who basically because he was shot [at] triggered an open warfare, and to say that it wasn't reasonably foreseeable, he's part of a group where the use of weapons was common, if not on a daily basis people were carrying weapons, it was close to daily.

The numbers of weapons that were introduced here, it would stretch credulity to think that Mr. Tabron could be part of this conspiracy and not understand that it was reasonably foreseeable to protect the drugs, to protect the profit, and to protect the turf that guns would be used. Therefore, I think the only fair inference from the incredible amount of evidence this Court has sat through is that whether or not he ever picked up a gun himself, he was in a conspiracy knowing full well either through absolute willful blindness which is also not—doesn't excuse him, or actual knowledge.

Either way, the Court would find that he is accountable for the use of—possession of weapons. It's not use but possession of the—it is hard to conceive of anyone not understanding what was going on out there as people were shooting at each other. So I'm not going to accept the dispute with the two point enhancement.

*Id.* at 16-17. In both excerpts—and throughout the rest of the hearing—the district court addressed the foreseeability question in some detail, but never determined the precise contours of the conspiracy Tabron joined. Without more, the district court's findings on foreseeability cannot pass for a finding as to the scope of Tabron's conspiratorial agreement: "The extent of a defendant's vicarious liability under conspiracy law is *always* determined by the scope of his agreement with his co-conspirators. Mere foreseeability is not enough . . . ." *Saro*, 24 F.3d at 288 (emphasis added).

The government attempts to stretch the district court's use of the phrases "with respect to the conspiracy he joined," "he's part of a group," "part of this conspiracy," and "in a conspiracy" into judicial findings. The most that can be said about such stray statements, however, is that they reflect the court's

assumption that Tabron joined the core of the Mahdi drug conspiracy. Such an assumption is not enough, however: "Even where the evidence likely supports the conclusion that there was a single conspiratorial agreement joined by all the defendants, the district court at sentencing must spell out in some detail the evidentiary basis for this conclusion." *Childress*, 58 F.3d at 722; *see also Saro*, 24 F.3d at 288-89 (rejecting the adoption of a presentence report that assumed that a defendant was "automatically responsible" for other conspirators' crimes (emphasis omitted)).

The district court, moreover, may not avoid its responsibility to "spell out" explicit findings by reasoning, as the court did here, that Tabron can be held responsible for the Mahdi gang's crimes because he pled guilty to a conspiracy and "[t]here is only one conspiracy in this case." Hr'g Tr. 14. As we held in *United States v. Mellen*, a decision issued after the district court sentenced Tabron:

> Where the record is unclear as to whether the crimes at issue constitute a single or multiple conspiracies, the sentencing court cannot assume the former and thereby obviate its duty to determine the scope of each defendant's agreement. What is more, even when there is but a single conspiracy, and there [is] sufficient evidence against each of the [defendants] to conclude that she or he agreed to further the purposes of this single conspiracy, we *still* require the sentencing court to determine the scope of each defendant's agreement.

*Mellen*, 393 F.3d at 184 (alterations in original) (internal citations and quotation marks omitted); *see also Childress*, 58 F.3d at 722 (same). The reason for this solicitude is obvious: a single loosely affiliated criminal enterprise may consist of a dense network of agreements. Tabron may therefore

appropriately object that the conspiracy he pled guilty to joining may not have been coterminous with the conspiracy his co-conspirators joined. *See Childress*, 58 F.3d at 710 ("Even if, for instance, there exists a core, single chain conspiracy, certain players may have performed activities wholly unrelated to the aims of the conspiracy. In addition, some courts have been reluctant to conclude that the chain conspiracy construct can automatically bind all participants in a drug distribution enterprise into a single agreement . . . when there are no indications of interdependence between the various participants." (internal citations and quotation marks omitted)). If, as Tabron claims, he functioned only as a fringe operator with a side agreement to sell drugs with co-conspirators (perhaps including Hooker) who never possessed weapons in furtherance of that side conspiracy, then the Mahdi gang's rampant gun possession would have no bearing on Tabron's sentence.

We are unpersuaded by the government's effort to distinguish *Mellen*. That case involved the conspiracy conviction of the husband of a government employee who stole upwards of $360,000 worth of electronic equipment from the Department of Education. *Mellen*, 393 F.3d at 178-80. At sentencing, the district court found the husband responsible for the theft of all equipment that passed through the couple's home on the theory that he "knew of his wife's involvement" in the scheme, at least to that degree. *Id*. at 180. We rejected this approach, reasoning that "[t]he fact that he knew what she was doing does not mean he agreed to it," *id*. at 185, and remanded to the sentencing court to determine the scope of the husband's conspiratorial agreement, *id*. at 186.

The government contends that *Mellen* differs from this case because

> [h]ere, by contrast, [Tabron] agreed to participate in the ongoing distribution of drugs with his co-conspirators, and the evidence showed that firearms and violence played an essential role in furtherance of this effort. [Tabron] agreed to join this conspiracy with full knowledge of this, and so was properly held accountable for the firearms.

Appellee's Br. 21. But just like Tabron, the defendant in *Mellen* was guilty of conspiring to commit a crime (stealing from the government). Just like Tabron, the defendant in *Mellen* knew that the unlawful activity (his wife's theft of electronic equipment) "played an essential role in furtherance of this effort." And just like Tabron, the defendant in *Mellen* "agreed to join [that] conspiracy with full knowledge" of the unlawful activity. Because we vacated in *Mellen*, so too must we vacate here; foreseeability is just not enough.

To be sure, the government recounts a litany of suggestive evidence from Abdur Mahdi's trial, including testimony that Tabron operated as a member of the drug gang and provided an AK-47 to one of Mahdi's relatives, *see id*. at 13-14, some of which might well justify imposing the gun bump. But to satisfy this circuit's "strict procedural mandate," the district court must link that evidence to a specific finding as to the contours of Tabron's conspiratorial agreement before it can attribute any co-conspirators' acts to him. *See Childress*, 58 F.3d at 722. Because the district court failed to do so, we vacate the gun bump, and because both parties agree that a ruling in Tabron's favor will not affect the term of his sentence, we remand solely on the question of the appropriateness of the two-level enhancement.

*So ordered.*