# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 15, 2007         Decided February 8, 2008

No. 06-3088

UNITED STATES OF AMERICA,
APPELLEE

v.

GWENDOLYN M. HEMPHILL AND
JAMES ODELL BAXTER,
APPELLANTS

———

Consolidated with
06-3089, 07-3016

———

Appeals from the United States District Court
for the District of Columbia
(No. 03cr00516-01)
(No. 03cr00516-03)

———

2

*Nancy Luque* argued the cause for appellant Gwendolyn M. Hemphill. With her on the briefs was *Arthur F. Fergenson*.

*Lisa Alexis Jones* argued the cause and filed the briefs for appellant James Odell Baxter II.

*Suzanne G. Curt*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III* and *Anthony Alexis*, Assistant U.S. Attorneys.

Before: GARLAND and BROWN, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Defendants Gwendolyn Hemphill and James Baxter appeal their convictions on multiple counts including embezzlement, money laundering, false pretenses, and conspiring to commit such crimes. We affirm the district court's judgments as to both defendants.

I

A

The charges arose from a seven-year orgy of greed during which Hemphill, Baxter, and several others stole millions of dollars from the Washington Teachers Union (WTU). Barbara Bullock, WTU's president during this period, and her chauffeur, Leroy Holmes, both pled guilty before trial.

For approximately seven years, Bullock, Hemphill, Baxter, and friends appropriated for their own benefit much of the money union members paid as dues. They embezzled these funds through several channels, including American Express (Amex) cards issued on WTU's account, checks written for fraudulent purposes and for excessive amounts, and payments to a front company, Expressions Unlimited. All union checks required two signatures, those of Bullock and Baxter, the union's president and treasurer respectively. These two, therefore, had the key to the union treasury.

Initially, Bullock and Baxter simply used their WTU Amex cards for personal expenses, and they spent quite a lot. But the thefts became more audacious when Hemphill was hired as Bullock's secretary and then also became the union's bookkeeper. Spending increased so dramatically that Baxter placed a $5,000 per month limit on Bullock's Amex spending. In response, the two opened a separate Amex account with WTU's credit, billed to Hemphill's home address. To pay the rapidly escalating bills on this account, they wrote checks to Expressions Unlimited, and they also passed money through Bullock's chauffeur, Holmes. Hemphill wrote him checks for about double his salary, and he returned the excess directly to her bank account.

The conspirators' thefts increased so significantly that in 2001, WTU paid $925,000 in credit card bills; by 2002, the union was broke and could not pay its membership fees for the American Federation of Teachers. Bullock and Baxter, WTU's officers, were forced to file fraudulent accounting and tax forms with the Department of Labor and the IRS. To cover the shortfall, they and Hemphill agreed to change a pending dues assessment of $16.09 per teacher to $160.09, reasoning that should questions arise, they could explain the discrepancy as a clerical error.

Between 1995 and 2002, the conspirators stole millions of dollars from WTU and spent it on such things as a $50,000 silver set for Bullock's house, a wedding reception for Hemphill's son, $29,000 in dental work for her and her husband, $19,000 in Washington Wizards tickets for Baxter and Bullock, car insurance for him, and art for his house. Sometimes they simply wrote themselves checks from the union treasury. After WTU received an infusion of cash from the inflated assessment in 2002, Hemphill and Baxter wrote themselves more checks totaling $18,805 and $31,000, respectively. In the end, the dues overcharge attracted so much attention the American Federation of Teachers alerted the federal government to WTU's suspicious finances.

B

Bullock pled guilty in 2003, and a grand jury indicted Hemphill and Baxter in November. The government filed a motion to exclude time to stay the seventy-day deadline imposed by the Speedy Trial Act, and the district court granted the motion on February 20, 2004. Trial began on May 31, 2005, and ended August 31. The jury convicted Hemphill and Baxter on all counts, while acquitting WTU's accountant. At the sentencing hearing, Hemphill's counsel first learned Holmes had a "history of minor thefts." The government knew Holmes had been arrested twice in Maryland for theft, but not whether indictments or convictions resulted from those arrests. Hemphill moved for a new trial, arguing Holmes's arrests were material information withheld by the government in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The district court denied her motion on October 18, 2005.

On May 22, 2006, the court sentenced Hemphill to 132 months in prison; she appealed on May 30. On June 5, 2006, the court sentenced Baxter to 120 months in prison; he appealed on June 14. Hemphill also appeals the district court's denial of her January 4, 2007, motion for a new trial. We consolidated the three appeals.

## II

We address Hemphill's issues first, some of which Baxter joins. Second, we discuss the questions appealed solely by Baxter.

## A

At the outset of the investigation, Hemphill agreed to be interviewed by FBI agents. The information she provided appears to have been quite useful to the government, which then obtained financial records detailing bank transactions by her, Bullock, and Expressions Unlimited; credit card activity; and payments to Baxter. Presumably her statements also helped the government negotiate pleas with Bullock and Holmes.

Therefore, Hemphill argues the district court abused its discretion by refusing to hold a *Kastigar* hearing. "*Kastigar*" is a misnomer for the hearing she demanded, because that case applies when the government compels a witness to provide incriminating information. *Kastigar v. United States,* 406 U.S. 441, 453 (1972). If the government later prosecutes that witness, it cannot use her information at all, directly or indirectly. *United States v. North*, 910 F.2d 843, 854 (D.C. Cir. 1990), *reh'g granted in part*, 920 F.2d 940 (D.C. Cir. 1990). In a *Kastigar* hearing, the government has the significant burden to show its evidence was "derived from a

source wholly independent of the compelled testimony." *United States v. Rinaldi*, 808 F.2d 1579, 1582 (D.C. Cir. 1987). By contrast, when, like Hemphill, a witness provides information voluntarily, the government is not obligated to agree to any particular scope of immunity. *See United States v. Smith*, 452 F.3d 323, 337 (4th Cir. 2006). The agreement between the government and the witness determines the scope of immunity. In a subsequent prosecution, the defendant has the burden to prove any government breach of the agreement. *United States v. Kilroy*, 27 F.3d 679, 684 (D.C. Cir. 1994) (citing *Santobello v. New York*, 404 U.S. 257 (1971)).

The terms of Hemphill's voluntary debriefing agreement determine what she had to prove or at least to allege to earn a hearing. We have not had occasion to interpret an agreement like Hemphill's, which permitted the government to "make derivative use of any statements or information provided by Ms. Hemphill during the voluntary, 'off-the-record' debriefing(s) . . . to pursue its investigation" and barred her from challenging any government evidence obtained through derivative use of her statements. In *Kilroy*, the government had offered the defendant "use immunity." *Kilroy*, 27 F.3d at 685. We interpreted that language to incorporate *Kastigar*, concluding the government had, in effect, promised to assume the burden of proving its evidence was not tainted by immunized testimony. *Id.* "Use immunity" covered both direct and indirect utilization. In *Hylton*, the defendant spoke to investigators under an agreement that expressly allowed derivative use, but the interpretation of that clause was not before us because at trial the government had assumed the burden of proving the evidence was untainted. *United States v. Hylton,* 294 F.3d 130, 132, 135 (D.C. Cir. 2002).

Clearly the immunity Hemphill accepted was narrow. "The Government agree[d] only that no statements . . .

provided by Ms. Hemphill . . . will be used directly against her" except in a prosecution for perjury or obstruction of justice, and the government preserved "[t]he admissibility of any evidence obtained through . . . derivative use of Ms. Hemphill's statements." Such language prohibits the government only from attributing to her the statements a defendant made or the information she provided as evidence against her. *See United States v. Pielago*, 135 F.3d 703, 711 (11th Cir. 1998). Hemphill contends the government used her information "directly" twice: first, Special Agent Andrews testified before the grand jury after interviewing her; second, a government auditor, Nicholas Novak, read reports about those interviews before he prepared charts summarizing the fraudulent transactions, about which he testified at trial. However, neither witness attributed any statement to Hemphill, so their testimony was not direct use within the meaning of Hemphill's agreement.

B

Next, Hemphill argues the district court should have granted her motion for dismissal based on the Speedy Trial Act, 18 U.S.C. § 3161. We review a district court's legal determinations under the Speedy Trial Act *de novo*. *United States v. Fonseca*, 435 F.3d 369, 371 (D.C. Cir. 2006).

Under the Speedy Trial Act, the government must bring a defendant to trial within seventy days of an indictment. 18 U.S.C. § 3161(c)(1). The seventy-day period excludes "[a]ny period of delay resulting from . . . any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(F). The "period of delay" includes the time during which parties prepare and file their briefs. *Henderson v. United States*, 476 U.S. 321, 331 (1986). If there is no

hearing or anticipated hearing, the excluded time continues from the point when the court takes a motion under advisement after all parties have filed their briefs until the court decides on the motion, as long as the court's consideration lasts no more than 30 days. § 3161(h)(1)(J); *Henderson*, 476 U.S. at 329; *United States v. Holmes*, 508 F.3d 1091, 1096 (D.C. Cir. 2007). In addition, a trial court may exclude time "resulting from a continuance granted . . . [for] the ends of justice." § 3161(h)(8)(A).

Here, the government's evidence involved thousands of financial documents. Because of the large volume of material, the government moved on January 9, 2004, for a continuance that would stay the seventy-day trial deadline imposed by the Speedy Trial Act. Defendants responded to that motion on January 27, 2004, three days before the deadline was originally set to expire, and the government filed its reply brief seven days later. Finally, on February 20, 2004, the district court granted the government's motion and extended the speedy trial deadline indefinitely.

Since the seventieth day after Hemphill's indictment was January 30, 2004, Hemphill contends this continuance was *nunc pro tunc*, in violation of the Act. If, in fact, the seventy-day Speedy Trial period ended on January 30, then the district court had no power to grant a continuance. The government violates the statute, when, without a trial, "dawn breaks on the [next] day" after the Speedy Trial period ends. *United States v. Taylor*, 497 F.3d 673, 677 n.4 (D.C. Cir. 2007). If, on the other hand, the government's motion tolled the clock, 43 days were excluded from the Speedy Trial period, and the district court had the power to grant the continuance.[1]

---

[1] Trial did not begin until May 31, 2005, over fifteen months after the district court granted the continuance. Hemphill does not challenge the length of this delay.

Although Hemphill urges us to create an exception from the Speedy Trial Act for motions to exclude time, we decline to do so. The statute itself excludes the time resulting from "any pretrial motion." § 3161(h)(1)(F). We have interpreted this phrase to mean what it says: *any* motion will toll the clock. *See United States v. Wilson*, 835 F.2d 1440, 1443 (D.C. Cir. 1987) (refusing to consider whether a motion actually caused delay or whether the motion was necessary to file before trial). Indeed, a defendant's motion to dismiss for a speedy trial violation will itself stop the clock. *Id*. at 1444. We agree with the First Circuit that a government motion to exclude time and obtain a continuance gives rise to an excludable period of delay. *United States v. Richardson*, 421 F.3d 17, 29 (1st Cir. 2005). Any motion may take time to resolve, and the Speedy Trial Act excludes that time from the seventy-day limit.

Hemphill argues that permitting government continuance motions to toll the Speedy Trial clock would allow prosecutors to exclude time unilaterally and arbitrarily. To the contrary, § 3161(h)(1)(F) gives the government the power to exclude only the day on which it files its motion. *See Fonseca*, 435 F.3d at 372 (holding that excluded time includes the day on which a motion is filed). After the government files a motion, the defense prepares its opposition, and that is the time excluded from the seventy-day period. How long this portion of the "period of delay" lasts is therefore in the defense's hands. The period of delay while the court considers the motion is, obviously, in the court's control. If the government had filed a frivolous, obstructive motion, the court could have denied it immediately. The government's motion here was sound enough that the court ultimately granted it.

10

C

Hemphill also appeals the district court's refusal to give a limiting jury instruction about the government's extensive embezzlement evidence. We think the district court erred, but its failure to give the limiting instruction was harmless.

The indictment charged Hemphill with six specific acts of embezzlement, as well as the general conspiracy to embezzle and commit fraud. The government introduced evidence of thousands of transactions in which Hemphill took money from the union. She argues this evidence was inadmissible on the embezzlement counts because it showed crimes other than the embezzlements charged. *See* FED. R. EVID. 404(b).

As the government notes, these transactions were all relevant to prove the conspiracy charged as Count One. The conspiracy comprised all the thefts and concealments; and "where the incident offered is a part of the conspiracy alleged . . . the evidence is admissible under Rule 404(b) because it is not an 'other' crime." *United States v. Mejia*, 448 F.3d 436, 447 (D.C. Cir. 2006). But unlike the defendant in *Mejia*, Hemphill faced charges in addition to conspiracy. With respect to the other charges, particularly the six specific embezzlements, the additional transactions were indeed other bad acts. Under Rule 404(b), these other transactions were not admissible to prove Hemphill's character in order to show she committed the specific embezzlements "in conformity therewith." *See* FED. R. EVID. 404(b).

When the prosecution introduces evidence of prior bad acts and the defendant requests a limiting instruction, a trial court "must immediately provide one." *United States v. Brawner*, 32 F.3d 602, 606 (D.C. Cir. 1994) (discussing

11

*United States v. Copelin*, 996 F.2d 379 (D.C. Cir. 1993)); *cf.* *United States v. Rhodes*, 62 F.3d 1449, 1453–54 (D.C. Cir. 1995) (trial court need not provide a limiting instruction *sua sponte* when prosecution introduces evidence suitable only for impeachment). Hemphill did not initially request a limiting instruction, but on June 21, 2005, she asked the court to tell the jury "that while it may consider the evidence to decide whether Mrs. Hemphill joined a conspiracy, it may not consider it as proof of the charged embezzlements." In addition, she suggested language for the instruction. Nevertheless, the district court refused to provide such an instruction during trial or when charging the jury.

Although the court erred, we will not reverse a conviction for a failure to issue a limiting instruction if the error was harmless. *See United States v. Thomas*, 114 F.3d 228, 266–67 (D.C. Cir. 1997). To uphold the conviction, we must analyze the trial record, *United States v. Olano*, 507 U.S. 725, 734 (1993), and find "fair assurance . . . that the judgment was not substantially swayed by the error." *United States v. Bailey*, 319 F.3d 514, 519 (D.C. Cir. 2003) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

Hemphill's conviction on the embezzlement charges could hardly have been affected by the additional evidence, because the government produced so much competent evidence to prove those specific charges, including cancelled checks recovered from banks and copies of them from the union offices after cancellation, as well as false memos written on the checks to conceal their true purposes. Trial Transcript at 4203–10. To prove illicit purchases, the prosecution introduced testimony from vendors who sold the items to Hemphill and Baxter. Trial Transcript at 2077–80, 2168–73, 2240–66. In addition, Bullock testified to Hemphill's involvement in the specific charged

embezzlements; and Novak summarized the charged transactions, Gov. Exh. C28.

Given the volume of evidence on these six counts, the district court's failure to give a limiting instruction about the other transactions was harmless error.

D

Next, Hemphill's challenge to the government's summary evidence is groundless. We review a trial court's decision to admit summary charts for abuse of discretion. *United States v. Lemire*, 720 F.2d 1327, 1350 (D.C. Cir. 1983).

Rule 1006 of the Federal Rules of Evidence allows a party to introduce a chart summarizing "[t]he contents of voluminous writings . . . which cannot conveniently be examined in court." To be admissible, a chart must summarize documents so voluminous "as to make comprehension 'difficult and . . . inconvenient,'" although not necessarily "literally impossible"; the documents themselves must be admissible, although the offering party need not actually enter them; the party introducing the chart must make the underlying documents reasonably available for inspection and copying; and the chart must be "accurate and nonprejudicial." *United States v. Bray*, 139 F.3d 1104, 1109–10 (6th Cir. 1998). In addition, as part of the foundation for a chart, the witness who prepared the chart should introduce it. *Id*. at 1110.

Hemphill contests the admissibility of the government's charts on all four of these conditions, but we address only one of her arguments in detail. The rest turn on her misapprehension that the government must actually introduce

the documents on which it bases a summary chart.[2]  To the contrary, the point of Rule 1006 is to avoid introducing all the documents.  As long as a party has laid a foundation for the underlying documents, a chart summarizing them can itself be evidence under Rule 1006.  Here, the government proffered certifications for the documents under Rule 902(11), and Hemphill's counsel does not appear to have objected.[3]

---

[2] In the district court, citing *United States v. Wittig*, No. 03-40142-JAR, 67 Fed. R. Evid. Serv. (Callaghan) 364, (D. Kan. May 23, 2005), Hemphill also argued the documents' certifications as business records, pursuant to Rule 902(11), violated the Confrontation Clause because she could not confront the documents' custodians.  It is unclear whether certifications are testimonial evidence, since they are, after all, affidavits prepared purposefully for use in prosecution; this court has not decided the question.  *Compare United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006) *with United States v. Adefehinti*, No. 04-3080, ___ F.3d ___, 2007 WL 4386110, at *8–9 (D.C. Cir. Dec. 18, 2007).  We do not address it here, because Hemphill has not presented the issue.  Instead, she suggests the chart evidence itself violated the Confrontation Clause.  Needless to say, bank records and credit card statements are not testimonial evidence, and that is what the Confrontation Clause regulates.  *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

[3] We cannot tell for sure whether the government entered the certifications into evidence, as it was required to do, *United States v. Johnson*, 594 F.2d 1253, 1256 (9th Cir. 1979) (citing 5 Weinstein on Evidence ¶ 1006-5) (1975) (noting that proponent of a chart must lay a foundation for the underlying documents).  Nor is it clear whether Hemphill's counsel objected.  Although Hemphill attacks the charts for lack of foundation in her opening brief, her actual argument is that Novak could not present the charts because he lacked personal knowledge of the transactions.  Of course, for charts entered under Rule 1006, he need only have knowledge of the documents he reviewed to prepare the charts.  Meanwhile, Hemphill does not raise the proper foundation issue until her reply brief, and she does not support her tardy argument with any record

In her most serious contention, Hemphill claims the charts were argumentative, prejudicial, and selective. In particular, she says Novak, the government auditor, used his accounting skills to prepare charts purposefully to show that Hemphill had a source of funds outside her regular income. But the fact that a non-expert witness, like Novak, prepared a chart or testified about it does not make the chart inadmissible. *See United States v. Scales*, 594 F.2d 558, 563 (6th Cir. 1979) (necessary only that the investigator "had properly catalogued the exhibits . . . and had knowledge of the analysis"). Nor is it problematic for a witness to perform some calculations in preparing a chart. *United States v. Evans*, 910 F.2d 790, 799–800 (11th Cir. 1990) (government witness added $100 per month to the defendant's accounts); *United States v. Jennings*, 724 F.2d 436, 442 (5th Cir. 1984) (government exhibit extrapolated defendant's reimbursement by assuming a value for average daily expenditure). Even if the calculations are mistaken, the chart is itself admissible, since admissible evidence may be unpersuasive and a defendant has the opportunity to rebut it. *Evans*, 910 F.2d at 800. Therefore, it was not error for the district court to allow Novak to testify about charts he prepared based on documents he reviewed.

E

In addition, Hemphill protests she was unable adequately to confront Holmes, a key government witness. First, she says the district court improperly limited her cross-examination of Holmes by barring questions about his proclivity for gambling, thus infringing her Sixth Amendment

---

evidence. In the absence of any information to show whether the government entered a foundation for the underlying documents, we cannot consider this issue.

right to confront him. Second, she accuses the government of withholding *Brady* information about Holmes.

Although the right to cross-examine and impeach a witness is an important component of the right of confrontation, *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974), a trial court retains broad discretion to control cross-examination, *id.* at 316. In particular, the court may prevent questioning that does not meet "[t]he basic requirement of relevancy, as well as other factors affecting admissibility." *United States v. Anderson*, 881 F.2d 1128, 1138–39 (D.C. Cir. 1989). Among those factors, "counsel must have a reasonable basis for asking questions . . . which tend to incriminate or degrade the witness." *United States v. Lin*, 101 F.3d 760, 768 (D.C. Cir. 1996). Thus, a trial court commits no error by rejecting an unfounded line of questioning, especially if the court leaves open the possibility of resuming the inquiry if the defense proffers a reasonable basis.

Defense counsel's illogical and attenuated inferences were not a substitute for relevance. Counsel wanted to show Holmes was a gambler in order to argue Holmes had a motive to steal the money on his own. But the evidence showed Hemphill continued to write checks to Holmes in excess of his salary, and the excess ended up in Hemphill's or Bullock's accounts. Trial Transcript at 3596. If Holmes thwarted the conspirators by retaining the excess, why would Hemphill have continued to use him? The trial court pressed Hemphill's counsel to offer any basis for thinking Holmes kept the excess money, but she provided no explanation. Trial Transcript at 3595–96. Since Holmes's gambling was not relevant for any purpose other than to suggest a motivation to steal the excess money, the trial court committed no error when it prevented counsel's inquiry.

16

Second, the government denies a defendant due process when it suppresses information requested by a defendant that is material to the defendant's guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Information is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citation omitted). Whether information was material is a question for *de novo* review. *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996).

Here, there is no dispute that the government knew Holmes had been arrested twice in Maryland for theft and did not disclose these facts. Impeachment evidence, such as a witness's prior crimes, is material if "the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness." *Id.* "[A]n incremental amount of impeachment evidence on an already compromised witness" is not material. *United States v. Derr*, 990 F.2d 1330, 1336 (D.C. Cir. 1993). Impeachment evidence is incremental "only if the witness was already impeached . . . by the same kind of evidence." *Cuffie*, 80 F.3d at 518.

Assuming Holmes's arrests led to convictions, the information would still be immaterial because the defense had impeached Holmes with the "same kind of evidence" as the supposed Maryland thefts, including the substantial thefts he committed during the WTU conspiracy. He had pled guilty to stealing much more substantial sums than those involved in the two undisclosed arrests. Moreover, the defense also impeached him with more damaging evidence, such as his perjury and other lies. For example, Holmes concealed his profits from the conspiracy by falsifying his tax returns, Trial Transcript at 3322–30, and he lied during the FBI's

investigation, Trial Transcript at 3374. The additional minor thefts could have done no further damage to Holmes's severely compromised credibility.

Our conclusion that Hemphill had the proper opportunity to confront Holmes,[4] together with our decision that the summary charts were properly in evidence, also disposes of the attack on her sentence. Since Hemphill's claim is simply that her sentence was based on improper evidence, namely the charts and Holmes's testimony, our decision that this evidence was proper means the appeal of her sentence must fail.

F

Finally, Hemphill appeals her convictions for money laundering, Counts Nineteen through Twenty-Three. First, she complains there was insufficient evidence to prove these charges. She apparently concedes the government introduced relevant evidence; she simply contends it was inadmissible. To the extent the government relied on the summary charts discussed by Novak, we have already concluded they were admissible. As for the other evidence necessary to support the money-laundering convictions, the government entered most of it without objection. For the few pieces to which Hemphill's counsel did object, she has provided no reason to question the district court's decision, in its discretion, to admit the evidence.

---

[4] Hemphill also suggests she could have used the supposed thefts to support her theory that Holmes stole the excess cash instead of returning it to her. This use would have failed, because Holmes's supposed prior thefts would not have been admissible to show he stole from Hemphill. FED. R. EVID. 404(b).

More seriously, Hemphill argues the prosecutor's closing argument confused the jury into convicting her for unindicted crimes. Hemphill and the government agree money laundering requires two transactions: the illegal generation of money and the concealment of that act. In this case, there was some confusion because the transactions were closely connected. The indictment characterized bank deposits or credit card payments as acts of concealment; the source of the funds was the checks. In closing, the prosecutor said the conspirators allowed checks to be written in their names in order to steal money and called that activity "money laundering." Hemphill criticizes this discrepancy from the indictment.

The confusion and argument over the money-laundering charges continued through the trial, but it is not clear whether Hemphill's counsel properly objected to the closing argument itself. In any case, we cannot see that the prosecution's misstatement was prejudicial.

In reviewing closing arguments, we ask whether any potential error was prejudicial to a defendant. *United States v. Gartmon*, 146 F.3d 1015, 1026 (D.C. Cir. 1998). Whether it was sufficiently prejudicial depends on its "severity, centrality, mitigation, and closeness of the case." *Id*. A single misstatement in a lengthy argument, like this one, is rarely a severe error, *id*. As for centrality, we look to the importance of the error itself, not of the issue it concerned. *Id*. Here, the prosecutor followed the misstatement in question by immediately saying "money came right on back . . . into Gwendolyn Hemphill's bank account. It is just another form of stealing and covering it up to get away with it." Thus, the prosecutor's statement, in context, differed only slightly from the indictment. There was mitigation, in that the court used the money-laundering charge Hemphill suggested.

19

Trial Transcript at 6957–61. Finally, there was abundant proof of the acts of concealment; the prosecution entered specific evidence for each count. In this context, the prosecutor's misstatement at closing was inconsequential.

III

Appellant Baxter appeals his convictions for conspiracy (Counts One and Sixteen) and various substantive offenses for lack of sufficient evidence; he challenges the jury instructions with respect to the conspiracy charge; and he appeals his sentence for lack of sufficient findings as to the scope of the conspiracy or the amount of the thefts. In addition, he challenges his indictment for conspiracy as "legally flawed."

A

In a sufficiency of the evidence review, we look at the evidence "in the light most favorable to the prosecution," and we ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond reasonable doubt." *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996) (emphasis in original). To prove a conspiracy charge, the government must show that the defendant agreed to engage in criminal activity and "knowingly participated in the conspiracy" with the intent to commit the offense, as well as that at least one overt act took place in furtherance of the conspiracy. *Id*. The conspirators must have agreed at least on "the essential nature of the plan," not necessarily on "the details of their criminal scheme." *Id*.

There was abundant evidence of criminal actions by the conspirators, so Baxter disputes his agreement on the essential nature of the plan. Even on this point, the

government introduced sufficient evidence. To start, Bullock testified that she stole WTU's money together with Hemphill and Baxter. Trial Transcript at 1261. Baxter made personal purchases, including $19,660 of Washington Wizards tickets and at least $5,000 of art for his home, using WTU's Amex card—a form of larceny Hemphill and Bullock had perfected. As the union's treasurer, Baxter signed blank checks written to Holmes. Baxter also wrote himself several "pension" checks drawn on the union's general fund rather than its pension fund, which was empty.

To show Baxter's involvement in concealing the thefts, the government introduced sequential drafts of fraudulent financial reports faxed to Baxter and recovered from his files. At least one of the drafts had handwritten notes showing how to report the conspirators' improper Amex expenditures falsely by distributing debits into other budget categories. In addition, Baxter signed a fraudulent form LM-2 that did not report payments to Hemphill or Holmes, even though handwritten notes recovered from Baxter's house recorded the total of those payments. Finally, when the conspirators decided to overcharge WTU's members, Bullock testified that Baxter came up with the idea of setting dues at $160.09 instead of $16.09 so the figure could plausibly be explained as a clerical error. In the two weeks after the proceeds of the overcharge arrived at the union, Baxter wrote himself WTU checks worth $31,000.

Thus, Baxter, Bullock, and Hemphill engaged in strikingly similar behavior. Some of Baxter's fraudulent transactions involved Bullock or Hemphill; for example, WTU checks required Bullock's signature or her signature stamp (which Hemphill possessed). And, of course, Baxter signed numerous fraudulent checks to Bullock, Hemphill, Holmes, and Expressions Unlimited (in addition to the checks

he wrote to himself)—without his signature on these checks, the embezzlement would not have been possible. Baxter was actively engaged in the concealment of the conspiracy. Moreover, he conceived the plan for the final concealment by overcharging the union's members. This evidence, relating to multiple aspects of the conspiracy, shows Baxter's consent to the "essential nature of the plan."

Baxter claims the jury should have discounted the dubious testimony of government witnesses and interpreted the evidence differently. For example, he asserts some of the checks he received were merely pension payments. However, since the government showed WTU was not contributing to other employees' pensions because of its financial straits, the jury was free to conclude Baxter's nominal pension payments were illegitimate. As another example, Baxter claims there was no evidence he received any personal benefit from the conspiracy, ignoring the fact that the Washington Wizards tickets and the art were delivered to his house. The jury was free to think these purchases were for his personal use. Baxter also says it was illogical to find he conspired in the improper credit card purchases, because he put $5,000 limits on Bullock's and Hemphill's corporate Amex accounts. Viewing this fact in light of all the other evidence, the jury could reasonably have noted Baxter did not close their accounts. In short, the government's evidence was sufficient, and Baxter asks us to second-guess the jury's interpretation of it. That, of course, we may not do.

Baxter also challenges the sufficiency of the evidence on the substantive offenses. First, he argues there were multiple conspiracies, rather than a single conspiracy, and consequently the substantive offenses were not foreseeable under *Pinkerton v. United States*, 328 U.S. 640 (1946). Second, he argues the government did not prove his

intentional or knowing involvement in the substantive offenses. We conclude the evidence showed a single conspiracy. Baxter does not suggest any further reason to think the substantive offenses were not foreseeable, so it follows his convictions were proper. Therefore we need not examine the evidence of his direct personal culpability for each substantive offense.

B

Baxter wanted the trial court to instruct the jury to consider whether the evidence proved multiple conspiracies. If "record evidence supports the existence of multiple conspiracies," then a district court must instruct the jury to consider them. *United States v. Graham*, 83 F.3d 1466, 1472 (D.C. Cir. 1996) (citing *United States v. Tarantino*, 846 F.2d 1384, 1400 (D.C. Cir. 1988)). On the other hand, when the evidence shows a single conspiracy, the court need not instruct on multiple conspiracies. *Id.*

Whether activities constitute a single or multiple conspiracies depends on several factors, including "whether participants shared a common goal . . .; interdependence between the alleged participants . . . and, though less significant, overlap among alleged participants." *Id.* at 1471. Overlap requires only that the main conspirators work with all the participants. *United States v. Mathis*, 216 F.3d 18, 23–24 (D.C. Cir. 2000). In addition, the general characteristics of similar conspiracies are also relevant. *Tarantino*, 846 F.2d at 1393. In particular, laundering of funds to hide their source can be part of a broader illegal profit-seeking conspiracy. *See id.* at 1393–94. A conspiracy may pursue multiple schemes with different *modi operandi* without dividing into multiple conspiracies, as long as there is a single objective. *See Gatling*, 96 F.3d at 1520 (single conspiracy involving the

same central figure comprised two schemes in different cities, operating in a different manner).  Moreover, "a conspiracy's purpose should not be defined in [terms] too narrow or specific . . . ." *Id.*

Each of the specific acts Baxter cites as proof of multiple conspiracies can be more sensibly interpreted as the pursuit of a single objective: to steal money from the union.  All the participants worked together to achieve that end.  As we have explained, each participant was engaged in each form of criminal activity, and Baxter cooperated with Bullock, Hemphill, and Holmes on various occasions to commit or conceal the thefts.  Concealment, of course, is a natural part of a conspiracy to steal money, as Baxter acknowledges.  The mere fact that the conspirators found different ways to transfer money to themselves (by improper credit card charges, payments to Expressions Unlimited, "pension" checks to Baxter, and overpayments to Holmes) does not break the conspiracy into parts.

Since the evidence showed a single conspiracy, the trial court properly refused to instruct the jury on multiple conspiracies, and the government's case did not vary from the indictment.

C

Baxter also protests the district court's failure at sentencing to enter specific findings about the scope of activity to which he agreed.  However, the court made all the findings required.  To be sure, a district court must describe explicitly "the scope of a defendant's conspiratorial agreement" before imposing a sentence that holds him responsible for his co-conspirators' "reasonably foreseeable conduct in furtherance of the joint undertaking."  *United*

*States v. Tabron*, 437 F.3d 63, 66 (D.C. Cir. 2006). We demand such findings because "[a] jury verdict convicting the defendants of participation in a single conspiracy . . . speaks to the scope of the defendant's agreement only in very general terms [but does not say] which specific actions were in furtherance of that single conspiracy or were foreseeable to the conspirators." *United States v. Childress*, 58 F.3d 693, 722 (D.C. Cir. 1995). Here, however, the government charged Baxter with the relevant conduct and obtained convictions on those charges under a *Pinkerton* instruction. Thus, Baxter's sentence held him responsible for acts found by the jury to be reasonably foreseeable crimes in furtherance of the conspiracy.

It was still necessary for the trial court to find Baxter's crimes resulted in losses of more than $2.5 million. Since the losses all arose from crimes of which the jury convicted Baxter, these findings did not need to revisit the scope of the agreement or the foreseeability of the crimes. Rather, the court was obligated to connect the actual quantities of loss caused by those crimes to evidence before the jury. It did, Sentencing Transcript at 16–18, so we will not vacate Baxter's sentence.

Finally, Baxter says the district court ignored its duty under 18 U.S.C. § 3553(a) to consider whether his sentence was greater than necessary to accomplish its purposes. In particular, he complains of the disparity between his sentence of ten years and Bullock's sentence of five years. However, the district court discussed the § 3553(a) factors thoroughly, explaining the disparity was reasonable because Bullock pled guilty and testified against her co-conspirators. Baxter makes no effort to explain why the district court should not have considered these factors. *Cf.* U.S. Sentencing Guidelines § 3E1.1 (decreasing offense level by 2-3 levels for a timely

guilty plea); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007) (disparity partly justified by the fact that co-conspirators "provided substantial assistance in the investigation of the scheme").

## D

Finally, Baxter challenges his conspiracy indictment, Count One, as depending on multiple, alternative object offenses. He argues an indictment on alternative grounds is valid only if all the grounds are legally permissible, and he contends one of his object offenses, deprivation of honest services, was legally flawed. However, he did not raise this claim before trial, as required by Rule 12(b)(3) of the Federal Rules of Criminal Procedure, and we decline to consider it without a showing of cause for relief from his waiver. *See United States v. Weathers*, 186 F.3d 948, 952–53 (D.C. Cir. 1999).

## IV

For the foregoing reasons, the judgments of the district court are

*Affirmed.*