Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 8, 2009         Decided March 6, 2009

No. 07-3142

UNITED STATES OF AMERICA,
APPELLEE

v.

RICARDO HENRY,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 06cr00079-01)

*Lisa B. Wright*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender. *Neil H. Jaffee* and *Mary M. Petras*, Assistant Federal Public Defenders, entered appearances.

*Jeffrey A. Taylor*, U.S. Attorney, argued the cause for appellee. With him on the brief were *Roy W. McLeese III*,

*Elizabeth Trosman*, *Thomas E. Zeno*, and *Suzanne G. Curt*, Assistant U.S. Attorneys.

Before: ROGERS and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This appeal involves the question whether harassing telephone calls made by Ricardo Henry to the family of a government auditor constitute obstructing justice within the meaning of § 3C1.1 of the U.S. Sentencing Guidelines ("U.S.S.G.") and so justified a two-point enhancement of his sentence. Section 3C1.1 requires "willful" conduct. Although a finding regarding a defendant's intent to obstruct justice may not be required where conduct is obviously obstructive and the defendant knew it would be, the obstructive nature of Henry's conduct is clouded because he apparently attempted to disguise his identity in placing the calls and did not otherwise link the calls to the auditor's investigation of him. Accordingly, we must remand the case for the district court to clarify the factual basis for the enhancement and, if necessary, resentencing.

## I.

Henry was president of Insight Therapeutic Services, Inc., a mental health clinic in the District of Columbia that submitted claims to Medicaid for mental health services rendered by Henry and others. On May 11, 2006, Henry was indicted for health care fraud, submitting false claims to Medicaid, bankruptcy fraud, and a variety of related offenses. On December 12, 2006, he pled to one count of submitting a false Medicaid claim, and the government moved to dismiss the remaining charges. The calculated Sentencing Guidelines range, including a two-point

§ 3C1.1 enhancement for obstruction of justice, was 27 to 33 months; the government recommended a sentence of no more than 27 months as set out in the plea agreement. The district court sentenced Henry to 20 months incarceration and 24 months supervised release.

In enhancing Henry's sentence, the district court based its understanding of the relevant facts on the grand jury testimony of Henry's sister and an FBI agent, as well as a report written by Special Agent Gerald Goldstein of the Office of the D.C. Inspector General. That record indicates Agent Goldstein was investigating Henry for Medicaid fraud. Henry apparently knew this because Agent Goldstein had in person requested documents from Henry in November 2001 and was the affiant on a search warrant for Henry's place of business in June 2002. Henry left several telephone messages on Agent Goldstein's answering machine in regard to the investigation after each of these two encounters. On August 31, 2002, Agent Goldstein's two adult daughters received telephone calls from a blocked number in which the caller identified himself as an agent of the Justice Department. The caller claimed to be investigating Agent Goldstein for "abusing his power" and stated he would send an agent to meet with the daughters. The caller had an accent, but the record is unclear as to what kind: Agent Goldstein in 2007 reported that one of his daughters identified the caller's accent as Carribean, but the sealed record presents contradictory evidence. Both calls ended inconclusively soon afterward, and the daughters informed their father of the calls. On September 5, 2002, Agent Goldstein's mother received a similar call, which she immediately reported to her son.

The district court found by a preponderance of the evidence that Henry made the calls to the Agent's family, and, although Henry denied it at the sentencing hearing, he now concedes as much, *see* Appellant's Br. at 12. The district court adopted the

recommendation of the presentencing report and, over Henry's objection, added a two- point enhancement for obstruction of justice based on the calls. Henry had argued that his conduct did not constitute obstruction of justice because he attempted to disguise his identity and avoided otherwise linking the calls to the ongoing investigation and thus intended only to harass and not to intimidate or influence a witness or hamper the investigation. The district court rejected his argument, observing: "Special Agent [Goldstein] linked these calls to the Defendant, [with] the heavy Carribean accent, and the Defendant in these voice mails had accused the Special Agent of, quote, abusing his authority, unquote, which [during] one of the calls the caller had told the agent's family about Special Agent Goldstein and used those words." Sentencing Hr'g. at 7. The district court therefore concluded that Henry's "purpose was to influence the witness [Agent Goldstein]." *Id.* Unpersuaded by Henry's objection that his behavior did not show an intent to obstruct justice because there was not a significant enough link between the calls and the investigation, the district court stated: "I don't know of any other message other than I can get to you through family or whatever . . . . So, I think in terms of the intent, I think it goes beyond just harassing . . . ." *Id*. at 18.

## II.

On appeal Henry contends that a sentencing enhancement under § 3C1.1 can apply only when a court finds the defendant either intended to obstruct justice or engaged in "inherently obstructive" conduct. Because he made efforts to hide the link between the harassing calls and the investigation, and because the record does not support the district court's apparent conclusion that he made the calls using his own accent, Henry maintains that the district court erred in enhancing his sentence and his case must be remanded for resentencing.

**A.**

The Supreme Court has instructed that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 128 S. Ct. 586, 596 (2007); *see United States v. Gardellini*, 545 F.3d 1089, 1092 n.2 (D.C. Cir. 2008).  The parties disagree about the proper standard for our review.  The government would apply a clear error standard to the obstruction of justice ruling, citing *United States v. Dozier*, 162 F.3d 120, 123 (D.C. Cir. 1998), while Henry distinguishes that case as involving the purely factual question of what conduct was committed whereas his appeal involves the question whether conduct that was clearly committed constitutes obstruction under U.S.S.G. § 3C1.1.  In Henry's view the relevant precedent is *United States v. Day*, 524 F.3d 1361 (D.C. Cir. 2008), where the court upheld a § 3C1.1 enhancement because it was "not error under the due deference standard," *id*. at 1373-74.

Before *United States v. Booker,* 543 U.S. 220 (2005), this court reviewed sentencing challenges under the "trichotomy" established in 18 U.S.C. § 3742(e): "[P]urely legal questions are reviewed *de novo*; factual findings are to be affirmed unless 'clearly erroneous'; and we are to give 'due deference' to the district court's application of the guidelines to facts." *United States v. Kim*, 23 F.3d 513, 517 (D.C. Cir. 1994).  Due deference lies "presumably . . . somewhere between *de novo* and 'clearly erroneous.'" *Id.*  In *Booker*, the Supreme Court held § 3742(e) unconstitutional to the extent it required an appellate court to reverse a sentence that fell outside the Guidelines range, 543 U.S. at 245.  In *United States v. Tann*, 532 F.3d 868 (D.C. Cir. 2008), this court held that, after *Booker,* the trichotomy described in *Kim* remains in place and the due deference standard still applies to the application of Guidelines to facts:

> The "due deference" standard survives *Booker* because that case did "not change[] how the Guidelines range is to be calculated." *United States v. Dorcely*, 454 F.3d 366, 375 n.6 (D.C. Cir. 2006). Accordingly, when we apply the first step of the two-step process outlined in *Gall* and [*United States v.*] *Olivares* [473 F.3d 1224 (D.C. Cir. 2006)], we do precisely what we did prior to *Booker* — determine whether the district court correctly calculated the Guidelines range and remand for resentencing if it did not. We therefore see no reason to think *Booker* displaced the congressionally mandated standard of review of a district court's application of the Guidelines to facts. As we noted in *Olivares*, every circuit to have considered the matter has arrived at the same conclusion. 473 F.3d at 1227-28.

*Tann*, 532 F.3d at 874.

*Tann* involved a two-point sentencing enhancement for the abuse of a position of trust, *id.*; U.S.S.G. § 3B1.3. Due deference is also appropriate here. Although at times our § 3C1.1 precedent has used phrases more in keeping with review for clear error, *see, e.g.*, *United States v. Monroe*, 990 F.2d 1370 1376 (D.C. Cir. 1993), or *de novo* review, *see, e.g.*, *United States v. Taylor*, 997 F.2d 1551, 1560 (D.C. Cir. 1993), when the court has focused on whether particular conduct was sufficient to warrant the enhancement, it has largely accorded due deference, *see, e.g.*, *Day*, 524 F.3d at 1373-74; *United States v. Maccado*, 225 F.3d 766, 769 (D.C. Cir. 2000); *see also Kim*, 23 F.3d at 517.

**B.**

Section 3C1.1 of the 2000 version of the Guidelines, which applies to Henry's sentencing, provides:

If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

U.S. SENTENCING GUIDELINES MANUAL § 3C1.1 (2000). The Commentary includes non-exhaustive lists of conduct that does and does not constitute obstruction of justice, and states that "[a]lthough the conduct to which this adjustment applies is not subject to precise definition, comparison of the examples . . . should assist the court." U.S.S.G. § 3C1.1, cmt. n.3. Among the examples of obstructive conduct is "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." *Id.* at cmt. n.4(a). In Henry's case, the district court applied the sentencing enhancement based on such conduct, finding it foreseeable that Agent Goldstein, as the lead investigator, would be a likely witness at Henry's trial.

Because § 3C1.1 applies to the "willful" obstruction or "attempted" obstruction of justice, it clearly contemplates some form of intent. *See* BLACK'S LAW DICTIONARY 1630 (8th ed. 2004) (defining *willful* as "[v]oluntary and intentional, but not necessarily malicious."); *id.* at 137 (defining *attempt* as "[a]n overt act that is done with the intent to commit a crime but that falls short of completing the crime"). The parties disagree, however, about what a defendant need intend under the law of this circuit. Henry argues the district court must find that the defendant specifically intended to obstruct justice, at least where the defendant's conduct is not "inherently obstructive," while the government argues the court need only find the defendant

intended to engage in an act listed as an example in the Commentary. Henry is correct to the extent our precedent holds that a § 3C1.1 enhancement is only appropriate where the defendant acts with the intent to obstruct justice, a requirement that "flow[s] logically from the definition of the word 'willful,' which, this court has suggested, 'requires that the defendant consciously act with the purpose of obstructing justice.'" *Monroe*, 990 F.2d at 1376 (quoting *United States v. Thompson*, 962 F.2d 1069, 1071 (D.C. Cir. 1992)). Other circuits have come to the same conclusion. *See, e.g.*, *United States v. Gage,* 183 F.3d 711, 716 (7th Cir. 1999); *see id.* at 717-18 (Posner, J., concurring) (collecting cases in the 2d, 5th, 7th, 9th, and 10th Circuits).

However, where a defendant willfully engages in behavior that is inherently obstructive – that is, behavior that a rational person would expect to obstruct justice – this court has not required a separate finding of the specific intent to obstruct justice. For example, in *Maccado*, the court upheld a § 3C1.1 enhancement for failure to provide a handwriting example because such failure "clearly has the potential to weaken the government's case, prolong the pendency of the charges, and encumber the court's docket" and the record did not show a lack of such an intent. 225 F.3d at 772. Still, our precedent is clear that where a defendant offers evidence that he acted without any subjective motivation to obstruct justice, a court must evaluate that evidence and can apply a § 3C1.1 enhancement only upon finding the defendant acted "with the purpose of obstructing justice," *Monroe*, 990 F.2d at 1376. Again, in *Maccado*, the court held that although a § 3C1.1 enhancement normally applies for the objectively obstructive conduct of failing to provide a handwriting exemplar, "[i]t remains for the district court to determine whether a defendant has offered a sufficient reason for failing to comply with the court order as would make application of the guideline inappropriate." 255 F.3d at 772. In

other words, although a court ordinarily may rely on the willing commission of conduct that, objectively viewed, tends to obstruct justice, such an objective standard serves only as a proxy of the actual subjective intent required by the Guideline. Where conduct is directly and inherently obstructive, the court may infer an intent to obstruct justice. But where the evidence shows such a proxy is not reliable and the defendant did not have the required intent, an enhancement is not warranted.

*United States v. Taylor*, 997 F.2d 1551 (D.C. Cir. 1993), relied on by the government, is not to the contrary. The defendant in *Taylor* argued he fled the courthouse during jury deliberations out of fear, without an intent to obstruct justice, and so enhancement under § 3C1.1 was unwarranted. This court upheld the enhancement in large part because the Guidelines had recently been amended to include flight to escape sentencing as an example of obstructive conduct. *Id.* at 1559-60. Although this holding has sometimes been interpreted as a signal that the specific intent to obstruct justice is not necessary under § 3C1.1, *see Maccado*, 225 F.3d at 772; *Gage*, 183 F.3d at 718 (Posner, J., concurring), such an interpretation is in tension with the Guidelines and with *Taylor* itself, which quoted *Monroe* for the proposition that "the willfulness requirement of section 3C1.1 arguably 'requires that the defendant consciously act with the purpose of obstructing justice.'" 997 F.2d at 1560 (quoting *Monroe*, 990 F.2d at 1376). The court in *Taylor* proceeded to describe how the defendant's behavior did, in fact, show an intent to obstruct justice:

> It is not a foregone conclusion the defendant's motivation of fear would have taken his conduct out of the *mens rea* requirement our sister circuits discerned under the unamended Guideline. That is, he fled because he was afraid, but presumably what his fear motivated him to accomplish was the obstruction of

> justice. It seems unlikely that he fled thinking the criminal justice process would go on in his absence, and if he thought so originally, he must have known better by the time he was free for five days before he ultimately surrendered to the bench warrant.

*Id*.

Thus, the court's reliance in *Taylor* on the Commentary listing of the conduct at issue is best understood not as an exception to the requirement of a showing of intent to obstruct justice, but rather as an acceptance of the Sentencing Commission's judgment that the defendant's behavior in that case necessarily showed such intent. As *Taylor* embraced our holding in *Monroe* that the text of § 3C1.1 requires the intent to obstruct justice, 997 F.2d at 1560, had *Taylor* further held that an enhancement is warranted because the defendant engaged in behavior listed in the Commentary, regardless of intent, it would have elevated the Commentary over the text of the Guidelines themselves in an impermissible manner. *Stinson v. United States*, 508 U.S. 36, 43, 45 (1993). Furthermore, nothing in *Taylor* contradicts the holding of *Maccado* that, even given inherently obstructive conduct, a court must review proffered evidence of a non-obstructive intent. In *Taylor*, this court, like the district court, considered and rejected the defendant's explanation that he fled only out of fear because the record showed he was aware of the requirement to be present, knew his failure to appear would obstruct justice, and willfully absented himself nevertheless, 997 F.2d at 1560, and so was "motivated . . . to accomplish . . . the obstruction of justice." *Id.* Of course, where conduct is inherently obstructive and no evidence is proffered to show non-obstructive intent, the district court can presume the existence of the requisite intent.

For these same reasons, the government's contention that a court need find only that a defendant engaged willingly in behavior listed in the Commentary examples, even in the face of evidence of a lack of intent to obstruct justice, is not well taken. Some of the examples listed in the Commentary, like failure to appear at a sentencing, require only factual findings by a court; the court need only find the defendant committed that act, and did so knowingly, to rely on the judgment of the Sentencing Commission that commission of the act shows the requisite intent, absent a showing of a contrary intent. *See Taylor*, 997 F.2d at 1560. Other Commentary examples, such as "indirectly attempting" to "unlawfully influenc[e] a . . . witness," require legal conclusions as to intent, and in order to find the defendant's conduct falls within the ambit of the Commentary example, a court must find the defendant willfully engaged in behavior that is objectively obstructive. For example, while the Commentary lists "committing, suborning, or attempting to suborn perjury" as an example of obstructive conduct, without any mention of the required intent, the Supreme Court has held that "a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same." *United States v. Dunnigan*, 507 U.S. 87, 95 (1993); *see United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004). Where threatening a witness is found to be inherently obstructive, and the defendant fails to proffer sufficient evidence of a different intent, a court need look no further because the conduct itself creates the presumed inference of obstructive intent. Where the conduct is indirect or ambiguous, a court must make a supported finding that the defendant acted with the intent to obstruct justice. *See Maccado*, 225 F.3d at 772.

## C.

On the current record, Henry's conduct in making the telephone calls to the investigator's family does not appear

inherently obstructive. It is possible to harass an investigator or witness without obstructing the investigation. Anonymously dumping garbage in an investigator's yard, for example, would be harassing but not obstructive. As we read the sentencing transcript, the district court did not conclude the act of making the calls was inherently obstructive, but rather relied on two factors to link Henry's conduct to the investigation and thereby find he intended to obstruct justice: his accent and his use of the phrase "abuse his power." It would not be clear error to find Henry made the call using his own accent since Agent Goldstein so stated in his declaration and his relatives were able to identify Henry's voice from a recording as the same voice they heard during the calls. It is not clear that the district court was making such a finding, however, because the court did not mention the evidence that indicated Henry may have attempted to disguise his identity by affecting a different accent. But even if the district court had made such a finding it would not suffice to show the requisite intent. Facts focused on by the district court — such as Henry's accent and his use of the phrase "abuse of power" — do not say anything about Henry's intent to obstruct. Neither the district court nor the parties suggest that his attempt to preserve his anonymity (or his failure to do so) is dispositive of the question of intent. This is especially so in light of the evidence that Henry also used a false name and blocked his telephone number. According due deference to the district's court's application of law to facts, these two factors are insufficient to support the finding that Henry's purpose was to influence Agent Goldstein as a witness.

Henry objected at sentencing that there was not a "significant enough link" between his telephone calls to the investigator's family and the on-going investigation of him. By this he presumably meant that he could not have intended to obstruct justice because, if his apparent plan to harass anonymously had succeeded, and if Agent Goldstein had been

motivated to execute his duties less vigorously, Agent Goldstein would not have known what investigation to sabotage. Neither the district court nor the government have addressed this inconsistency. The district court replied to Henry's objection that "the whole point" of the Guidelines in punishing attempted "indirect" influence or intimidation of witnesses "is that you don't have to say I'm doing this so that he stops . . . [the] investigation into . . . my activities . . . . But clearly it's targeted to people who would be . . . associated with the Special [A]gent who clearly would be family who would let him know. And I don't know of any other message other than I can get to you through family or whatever." Sentencing Hr'g 17-18. The district court thus concentrated on the severity of the threat or the link between Agent Goldstein and his family, rather than on the link between the calls and the investigation. The district court was correct that Henry cannot be relieved of the § 3C1.1 enhancement simply because he called Agent Goldstein's family members, rather than the Agent himself. However, unlike the defendant in *United States v. Jackson*, 974 F.2d 104, 105 (9th Cir. 1992), who attempted to influence a witness indirectly, Henry took steps to prevent Agent Goldstein from knowing who made the threats or linking those threats to the Agent's investigation of Henry. The district court stated the implied message in Henry's calls was "I can get to you through family," Sentencing Hr'g at 18, but on this record Henry seems to have attempted to obscure the identity of the "I" doing the threatening.

The government suggests the calls were linked when Agent Goldstein discovered the identity of the caller. But the question is whether Henry intended that they be linked. The government's reliance on *United States v. Searcy*, 316 F.3d 550 (5th Cir. 2002), for the proposition that a threat need not be direct in order to obstruct justice is misplaced. In *Searcy*, the defendant, who was on pre-trial release, had unsuccessfully

attempted to plant drugs at the home of a cooperating witness who had informed on the defendant, *id.* at 551. Unlike Henry's intent, Searcy's intent to obstruct was clear because "had Searcy's plan succeeded, the credibility of a potential Government witness would have been undermined, adversely affecting the Government's ability to present its case." *Id.* at 553. To the extent the government relies primarily on *United States v. Chavarria*, 377 F.3d 475 (5th Cir. 2004), in urging that Henry had the requisite intent, that case is clearly distinguishable. In *Chavarria*, the defendant had made a graphic threat to an arresting officer, threatening to disembowel him and burn down his house, and claiming membership in a well-known gang. *Id.* at 477. The district court rejected the defendant's explanation he had reacted in pain without any intent to obstruct justice, and the enhancement for obstruction of justice was upheld on appeal on review for clear error. Whatever the persuasive force of *Chavarria*, *see id.* at 482 (Dennis, J., dissenting), the officer/potential-witness could have no doubt that the threat was directly tied to the defendant's case, and, to the extent the officer found the threat credible and adjusted his behavior, the threat would obstruct the prosecution of the defendant's case. If Henry's calls had remained anonymous, the record suggests no reason to think they were of such number or severity that could have affected Agent Goldstein's investigation of Henry.

Henry's conduct in calling Agent Goldstein's family is difficult to explain. Perhaps he intended, as he contends, only to inflict petty revenge with no effect on the investigation. Perhaps, as the government suggests, he wanted to impede the investigation but not leave enough evidence to get caught doing so. Perhaps he had some other intent altogether, or a murky intent, or multiple, inconsistent intents. A number of these scenarios are consistent with the record evidence and would still qualify him for the sentencing enhancement. However, absent

15

findings by the district court that offer a sufficient explanation of what intent Henry had, other than the summary assertion that his "purpose was to influence the witness" — a conclusion that is difficult to square with the evidence of his efforts at concealment without further findings or explanation — a remand is necessary. Accordingly, we remand the case for the district court to clarify the factual basis for the enhancement and, if necessary, resentencing.