GRIFFITH, Circuit Judge:
A jury found Nelson Broekenborrugh guilty of wire fraud and conspiracy to commit wire fraud, and the district court sentenced him to 46 months in prison. On appeal, Broekenborrugh contends that the evidence produced at trial was insufficient to support his convictions and that a number of the district court’s rulings were erroneous and sufficiently prejudicial to warrant a new trial. He also argues that the district court made three errors in calculating his sentence. For the reasons set forth below, we reject these arguments and affirm Brockenborrugh’s convictions and sentence.
I.
A.
Because Brockenborrugh’s appeal relies in large measure on an argument regarding the sufficiency of the evidence presented at trial, we must recount that evidence in some detail. When James Roy died on October 13, 2004, he left to his heirs a multiunit residential property located at 1133 6th Street N.W., Washington, D.C. Although the condition of the property deteriorated after Roy’s death, its location a block from the city’s new convention center attracted the interest of a number of developers. Named as the executor of her father’s estate, Katrina Robinson had to decide what to do with the rundown property. Robinson first met Broekenborrugh while visiting the property in April 2005. According to Robinson, Broekenborrugh, a retired police officer who worked as a Court Security Officer (CSO) at the D.C. Superior Court, and his realtor, Denise McLeod, were at the site and asked her about buying the property. During this conversation, McLeod told Robinson she was an employee of the D.C. government, introduced Broekenborrugh as a U.S. Marshal, and said, “[W]e have been watching your property, because we have been getting several complaints ... about the things ... going on there.” Trial Tr. 189-90 (Oct. 23, 2007). Broekenborrugh told Robinson that he was “working with” the U.S. Marshals, Trial Tr. 44 (Oct. 24, 2007), showed her a gold-plated badge, and stated that he was a retired police officer. Robinson told them that once she was officially appointed executor, she would consult with her family and then decide whether to sell. The three exchanged phone numbers, and Robinson told Brockenborrugh and McLeod to contact her lawyer, David Scull, if they remained interested in buying the property. On June 21, 2005, McLeod called Scull. She told him *731 that “U.S. Marshal Brockenborrugh wanted to buy the property” and could assist in solving the problem created by squatters who had moved into its abandoned units. Trial Tr. 131 (Oct. 18, 2007). McLeod also advised Scull that she was “monitoring every aspect” of the property. Id. at 132.
On September 8, 2005, McLeod filed with the District of Columbia Recorder of Deeds a fraudulent deed that purported to convey the property from James Roy to her for $10,000. Because the deed reflected a nominal sale price, the District required an additional payment of $7610, which included a transfer tax and recording fee based on the assessed value of the property. Two other people helped McLeod file the deed. Cynthia Russell “witnessed” James Roy’s signature (though, of course, Roy did not posthumously sign the deed). LaShawn Lewis notarized the deed in return for $250. (Both pleaded guilty to charges related to these actions.) A week later, Brockenborrugh wrote McLeod a check for $8804, approximately one half of the total purchase price, and noted on the memo line, “For my half of 1133 6th St NW.” App. at 49. At trial, Brockenborrugh testified he wrote the check because he “just wanted to make sure that [he] was included in to what [he] thought was a legal transaction.” Trial Tr. 88-89 (Oct. 25, 2007). He had asked McLeod, “[H]ow much do I owe you?,” id. at 155, and she responded, “[R]ight now I don’t know what the total price is going to be, but for now I have had to pay the water and tax bill ... [s]o this is what the price is,” id. at 155-56. McLeod subsequently agreed to sell the property to developer Kenneth Silbert for $300,000. When Silbert’s lawyer conducted a title search, he uncovered the fraudulent deed. Silbert instructed him not to tell Robinson.
On October 6, 2005, Metropolitan Police Department Officer Israel James was called to the property, where he found Brockenborrugh and McLeod. Brockenborrugh was wearing his CSO uniform and may also have been wearing his CSO security badge. According to Officer James, the two claimed they had “authority” over the property and complained that squatters needed to be removed. Trial Tr. 33-34 (Oct. 22, 2007). Brockenborrugh does not deny he was at the property but claims that only McLeod talked to the police. Two investigators from the fire department also responded at the scene. Because the squatters had been poaching electricity and creating a fire hazard, they declared the property uninhabitable and ordered the squatters to leave. Later that day, a bystander called Robinson to report that McLeod was hanging around the property saying she was the new owner. The caller then passed the phone to McLeod, who told Robinson she “was getting [the squatters] out” and would “contact her later.” Trial Tr. 202 (Oct. 23, 2007). Wondering why McLeod was at the property, Robinson called her lawyer, Scull. Scull ran his own title search, discovered the fraudulent deed assigning the property to McLeod, and, with the encouragement of Robinson, called the FBI.
On October 19, 2005, Robinson, wearing an FBI wire, met with Brockenborrugh, McLeod, Silbert, and Nathan Carter, who is alleged to be the person that would finance any purchase of the property. During their conversation with Robinson, members of the group made representations that implied the property was worthless, and Brockenborrugh claimed responsibility for the removal of the squatters. As a retired police officer, he said that he had asked a few current officers whom he knew to keép an eye on the property. This increased protection, he boasted, had prevented the squatters from reentering and ended the neighbors’ complaints about the property’s condition. Brockenborrugh *732 added that one of the squatters had seen him at the courthouse and said, “[0]h you’re a real marshal.” App. at 105. Robinson interjected, “Oh he didn’t think you were?” Id. at 106. “He didn’t believe it,” confirmed Brockenborrugh. Id. Brockenborrugh testified that he did not correct the occupant because the comment “didn’t really phase [sie][him].” Trial Tr. 174 (Oct. 25, 2007).
Brockenborrugh, McLeod, and Carter also told Robinson that she faced a number of risks by retaining the property. For example, they warned her that the squatters might burn down the building. Brockenborrugh said the situation was “really, really serious” and that each passing day was like “spinning the roulette wheel.” App. at 117. McLeod told Robinson that the squatters could sue her because the building contained asbestos that was making them ill. She also warned Robinson that the city could file a “wrongful housing” suit and assess a fine on the property but had not yet done so because of Brockenborrugh’s influence. Id. at 118— 19.
Robinson said that her family wanted $825,000 for the property. McLeod rejected that price out of hand. She argued that the building itself was worth nothing and that the land was worth only $99,000 to $130,000. The group offered Robinson $130,000 and presented her with a contract. Robinson asked for more information about all the buyers except for Brockenborrugh. She stated that she “[knew] about Mr. U.S. Marshall [sic].” Id. at 137. Brockenborrugh urged Robinson to act quickly, adding that the police would check on the property so long as he was “still in the mix.” Id. at 143. If he did not “do his part,” they would stop. Id. at 144.
Two days later, McLeod faxed to Robinson a document that purported to be an official District of Columbia “Property Detail,” which contained fictitious assessments of the property. The document was fraudulent in several respects, and the value of the property’s improvements was listed as “$0.00 (inhabitable) [sic],” id. at 50-51. McLeod later faxed a revised contract along with a letter assuring the Roy heirs that the only issues revealed by a title search were outstanding property taxes and water bills. Obviously, the letter did not mention the fraudulent deed.
The FBI convened a second meeting with the group, during which an undercover agent posed as “James Roy, Jr.” Also present were Robinson, another undercover agent, McLeod, Carter, and Silbert. McLeod explained that Brockenborrugh could not make the meeting because, as “a U.S. Marshall [sic],” he was “assigned to a judge” that day. R. Material Tab 3, 3. The agent posing as James Roy, Jr., stated that he wanted $200,000 for the property. The parties eventually agreed to a purchase price of $165,000. At that point, Brockenborrugh joined the meeting via speakerphone. McLeod told him that “James Roy” wanted $165,000 and asked, “[C]an we go forward with that?” Id. at 32. Brockenborrugh replied, “I’ll go with that.” Id. at 33.
B.
By an indictment filed March 22, 2007, the grand jury charged Brockenborrugh and McLeod with five crimes: (1) wire fraud in violation of 18 U.S.C. § 1343; (2) conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349; (3) first-degree fraud in violation of D.C.Code §§ 22-3221(a), -1805; (4) forgery in violation of D.C.Code §§ 22-3241, -1805; and (5) uttering a forged instrument in violation of D.C.Code §§ 22-3241, -1805. McLeod pleaded guilty to each count shortly before trial and did not take the stand. The jury found Brockenborrugh guilty of wire fraud *733 and conspiracy to commit wire fraud, but acquitted him of the other charges.
At trial, the district court made three rulings relevant to this appeal. The first concerned whether Robinson’s attorney, Scull, could testify about statements McLeod made to him during their June 21, 2005, telephone conversation. The district court admitted the testimony under Federal Rule of Evidence 801(d), which provides an exemption to the rule against hearsay for statements of a co-conspirator made in furtherance of the conspiracy. Second, the district court ruled that the government could question Brockenborrugh about his sexual relationship with McLeod, finding that the prejudicial value of the testimony would not outweigh its probative worth. And third, the district court refused Brockenborrugh’s request for a jury instruction on multiple conspiracies, finding it was not supported by the evidence.
At sentencing, the parties agreed that section 2B1.1 of the Federal Sentencing Guidelines, which governs offenses involving fraud, applied and that Brockenborrugh’s base offense level was 7. See U.S. Sentencing Guidelines Manual § 2B1.1 (2007) [hereinafter U.S.S.G.]. The parties disagreed, however, over how much the court should increase Brockenborrugh’s sentence under that section, which ties a defendant’s total offense level to the amount of loss for which he is responsible, see id. § 2Bl.l(b). The district court concluded that Brockenborrugh’s conduct involved an intended loss between $200,000 and $400,000, and thus warranted a twelve-level increase. Over Brockenborrugh’s objection, the district court also applied two enhancements: (1) a two-level enhancement for abuse of trust because Brockenborrugh falsely represented that he was a U.S. Marshal to significantly facilitate his offense; and (2) another two-level enhancement for obstruction of justice because Brockenborrugh lied on the stand. The resulting offense level was 23, which translated into a sentencing range of 46 to 57 months under the Sentencing Guidelines because Brockenborrugh had no prior criminal history. The district court sentenced Brockenborrugh to 46 months’ imprisonment followed by two years of supervised release.
II.
On appeal, Brockenborrugh renews his challenges to the district court’s trial and sentencing rulings and also argues that there was insufficient evidence for a jury to conclude he engaged in any fraudulent conduct. We have jurisdiction to consider these arguments under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.
We begin with the argument that there was insufficient evidence to support Brockenborrugh’s convictions. Our review of such challenges is narrow. We must view the evidence in the light most favorable to the government and “accept the jury’s guilty verdict if we conclude that ‘any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’ ” United States v. Branham, 515 F.3d 1268, 1273 (D.C.Cir.2008) (quoting United States v. Arrington, 309 F.3d 40, 48 (D.C.Cir.2002)). Brockenborrugh does not dispute that the evidence established two attempts to fraudulently obtain the property located at 1133 6th Street N.W.: the filing of the forged deed and the effort to cause the Roy heirs to sell the property for an unreasonably low price. Nor does he dispute there was a conspiracy to get the property unlawfully. Rather, Brockenborrugh argues that the evidence did not prove that he knowingly sought to defraud the Roy heirs or participated in a conspiracy to do the same. To commit wire fraud, he must have knowingly and willingly entered into a scheme to defraud. To be convicted of conspiracy, he *734 must have entered into an agreement with another with the intent to commit wire fraud. See United States v. Alston-Graves, 435 F.3d 331, 337 (D.C.Cir.2006). In Brockenborrugh’s view, the evidence showed only that he thought “the attempted purchase of 1133 Sixth Street from the heirs was progressing in the same manner as a lawful real estate transaction.” Br. of Appellant at 27.
We disagree. There is ample evidence in the record from which the jury could reasonably infer that Brockenborrugh was a knowing participant in the unlawful scheme to obtain the property. To begin with, the jury could conclude from Brockenborrugh’s connection to the forged deed that he knowingly entered a scheme with McLeod to defraud the Roy heirs. This inference finds support in the check Brockenborrugh wrote McLeod after learning she had “purchased” the property. See App. at 49. Although the defense argued that Brockenborrugh did not think this was his final payment, the jury could have reasonably found that Brockenborrugh thought that it was and that he knew the property was being obtained by fraud.
Brockenborrugh argues that the jury’s verdict on the D.C. counts of fraud, forgery, and uttering a forged instrument shows that he was “acquitted of all counts directly relating to the forged deed.” Br. of Appellant at 9. Not so. As we just explained, the federal counts also implicate the forged deed. The jury’s verdict on the D.C. counts in no way undermines this conclusion. Under D.C. law, a person commits the offense of forgery or uttering “if that person makes ... or utters a forged written instrument with the intent to defraud ... another.” D.C.Code § 22-3241(b). Anyone who advises, incites, aids, or abets forgery or uttering is liable as a principal. Id. § 22-1805. Brockenborrugh’s conduct does not fall within either provision. He did not make or utter the forged deed, and there is no evidence that he advised or aided its creation. Likewise, a person commits first-degree fraud under D.C. law if he actually defrauds another thereby causing that person to lose his property. Id. § 22-3221(a). The scheme to get the property was ultimately unsuccessful. That there was insufficient evidence to convict Brockenborrugh of these crimes under D.C. law does not absolve him of his involvement with the forged deed under the federal counts.
Brockenborrugh’s knowing participation in the fraud can also reasonably be inferred from his role in the second attempt to secure the property from the Roy heirs. The evidence shows that Brockenborrugh falsely represented to Robinson that he was a U.S. Marshal, and Robinson testified that Brockenborrugh led her to believe that he had influence over police officers who were protecting the property on his behalf. Brockenborrugh also suggested to Robinson that if the property was not sold to his group, police protection would cease, the property would be ruined, and the estate would be liable. These actions were vital to the plot to convince Robinson to sell the property at a deflated price, and a jury could reasonably infer from them that Brockenborrugh knowingly entered into a scheme with his co-conspirators to defraud the Roy heirs.
III.
Brockenborrugh challenges three trial rulings: (1) the decision to allow attorney Scull to testify about statements McLeod made to him in June 2005; (2) the decision to allow the government to cross-examine him about his sexual relationship with McLeod; and (3) the refusal to give a jury instruction regarding the existence of multiple conspiracies. We consider each in turn.
*735 A.
Over the objection of defense counsel, the district court allowed Scull to testify about statements McLeod made during their June 2005 phone conversation. According to Scull, McLeod said that “U.S. Marshal Brockenborrugh” wanted to buy the property and could assist with the squatter problem. Trial Tr. 131 (Oct. 18, 2007). The district court provisionally admitted this testimony subject to proof of a conspiracy under Federal Rule of Evidence 801(d)(2)(E), which provides that a statement is not hearsay if it is offered against a party and is made “by a coconspirator of [that] party during the course and in furtherance of the conspiracy.”
The question on appeal is whether the district court correctly found that Brockenborrugh and McLeod were engaged in a conspiracy at the time McLeod made the statements to Scull. At the close of the government’s case, the prosecutor argued that a conspiracy, as that term is used in Rule 801(d)(2)(E), could be inferred as early as April 2005 or at the latest by September 2005, when Brockenborrugh wrote the check to McLeod. The district court found that there was “overwhelming evidence of a business relationship between Ms. McLeod and Mr. Brockenborrugh” in April 2005, Trial Tr. 48 (Oct. 25, 2007), and “overwhelming evidence that there was a conspiracy to commit wire fraud” in September 2005, id. at 49. Brockenborrugh argues that although the district court may have ruled on the existence of a conspiracy in April and September, it failed to find a conspiracy in June.
We typically review the admission of evidence under Rule 801(d)(2)(E) for clear error. See United States v. Gatling, 96 F.3d 1511, 1521 (D.C.Cir.1996). The government, however, argues that the plain error standard of review applies because defense counsel did not renew the objection or move to strike Scull’s testimony after the district court ruled on the scope of the conspiracy.[1] Because we find that the district court committed no error-clear, plain, or otherwise — in admitting the testimony we need not decide which standard best fits these facts.
We have previously explained that when admitting testimony under Rule 801(d)(2)(E), “the district court must find by a preponderance of the evidence that a conspiracy existed and that the defendant and declarant were members of that conspiracy.” United States v. Gewin, 471 F.3d 197, 201 (D.C.Cir.2006). Admission, however, is not contingent upon the finding of an unlawful combination. Rather we have held that, despite its use of the word “conspiracy,” Rule 801(d)(2)(E) allows for admission of statements by individuals acting in furtherance of a lawful joint enterprise. See Gewin, 471 F.3d at 201-02; United States v. Weisz, 718 F.2d 413, 433 (D.C.Cir.1983) (stating that the rule, which derives from agency and partnership law, “embodies the longstanding doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are ... admissible against the others, if made in furtherance of the common goal”). Citing Gewin, the district court found “overwhelming evidence” that Brockenborrugh and McLeod were engaged in a “business relationship” as early as April 2005. Trial Tr. 48 (Oct. 25, 2007). Our review of the record supports this conclusion and reveals ample evidence that this relationship continued such that in June 2005, the pair was *736 engaged in a lawful joint enterprise to acquire the property. For example, Broekenborrugh testified that McLeod, at the time of her conversation with Scull, was acting as his real estate agent for his attempted purchase of the property. Id. at 78-81. McLeod’s statements to Scull that “U.S. Marshal Broekenborrugh” was interested in buying the property were made in furtherance of this enterprise and properly admitted.
B.
Broekenborrugh also argues that the district court erred in allowing the government to cross-examine him about his sexual relationship with McLeod. We review this ruling for abuse of discretion. See United States v. Fonseca, 435 F.3d 369, 373 (D.C.Cir.2006).
After hearing arguments from both sides, the district court determined that cross-examination was needed to show the “closeness” of Brockenborrugh’s relationship with McLeod and “for ... impeachment purposes to cast doubt [on Brockenborrugh’s] credibility.” Trial Tr. 57 (Oct. 25, 2007). The court concluded that any prejudice that might result from questions asked about the sexual relationship would be outweighed by the probative value of the testimony given. When Brockenborrugh took the witness stand, defense counsel asked him to tell the court and the jury “basically” his relationship with McLeod. Id. at 68. Broekenborrugh answered that McLeod “did taxes” for half of the CSOs in the courthouse, “did real estate,” and was his property manager. Id. at 68-69. He did not mention the sexual component of the relationship. On cross-examination, the prosecutor first asked Broekenborrugh if he had a chance to finish his answer about the relationship, and Broekenborrugh responded that he had. The prosecutor pressed further and questioned him about his sexual relationship with McLeod. Only then did Broekenborrugh acknowledge its existence between 2002 and late 2004 or early 2005. He also admitted to concealing the relationship when first interviewed by the FBI. See id. at 133-39. At the close of trial, the court instructed the jury not to consider the sexual relationship as proof of Brockenborrugh’s bad character but only as evidence of the true nature of his relationship with McLeod and of Brockenborrugh’s credibility based on his failure to describe the full extent of that relationship during his direct testimony.
The district court acted well within its discretion in permitting the cross-examination. Cross-examination of a criminal defendant is permissible on the subject matter of the defendant’s direct examination and matters affecting credibility. See Fed.R.Evid. 611(b); see also United States v. Raper, 676 F.2d 841, 846 (D.C.Cir.1982). Brockenborrugh’s testimony on direct examination suggested that he and McLeod had nothing more than a business relationship. The government was therefore entitled to elicit further testimony to show - the true nature of the relationship. Broekenborrugh argues that cross-examination on this subject should have been prohibited under Federal Rule of Evidence 403, which allows for the exclusion of evidence if its “probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” The district court, however, “ ‘is in the best position to perform [the] subjective balancing’ required under Rule 403.” United States v. Johnson, 519 F.3d 478, 483 (D.C.Cir.2008) (quoting United States v. Cassell, 292 F.3d 788, 795-96 (D.C.Cir.2002)) (alteration in original). Upon review, we see no abuse of discretion in the balance struck by the district court. The *737 probative value of the evidence was substantial as it spoke to the central issue in the case: whether Brockenborrugh was a knowing participant in the fraudulent scheme or an innocent real estate investor caught up in McLeod’s thievery. The only prejudicial effect identified by Brockenborrugh is the possible inference “that a person who ‘cheats’ on his wife cannot be trusted,” Br. of Appellant at 33. Any such effect was mitigated by the district court’s instruction to the jury to disregard the relationship as evidence of bad character. Cf. Greer v. Miller, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (“We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it....”).
C.
Brockenborrugh’s final contention regarding his trial is that the district court erred in refusing to instruct the jury to consider whether the evidence supported the existence of multiple conspiracies. The district court determined that such an instruction was not warranted. We review this decision de novo. United, States v. Dickerson, 163 F.3d 639, 641 n. 3 (D.C.Cir.1999). If the record supports the existence of multiple conspiracies, the jury must be instructed to consider them. United States v. Hemphill, 514 F.3d 1350, 1363 (D.C.Cir.2008). Brockenborrugh argues that a jury could have found several conspiracies to obtain the property and that he was involved in only some of them. This instruction, according to Brockenborrugh, would have allowed the jury to distinguish his legitimate activities from the fraudulent ones of McLeod and others. For example, Brockenborrugh argues that the creation of the forged deed and its concealment from Robinson were two separate conspiracies, and that he was not involved in either. But a single conspiracy can “pursue multiple schemes with different modi operandi without dividing into multiple conspiracies, as long as there is a single objective.” Id. at 1364. Whether a course of conduct should be classified as a single conspiracy or divided into multiple conspiracies depends on whether the participants shared a common goal, were dependent upon one another, and were involved together in carrying out at least some parts of the plan. See United States v. Mathis, 216 F.3d 18, 23-24 (D.C.Cir.2000); cf. Hemphill, 514 F.3d at 1364 (“The mere fact that the conspirators found different ways to [carry out their crime] does not break the conspiracy into parts.”).
We think the record is best interpreted as showing a single conspiracy to acquire the property. Although the conspirators may have tried to achieve their goal in different ways, their actions demonstrate pursuit of a sole objective: the fraudulent acquisition of the Roy property. McLeod filed a forged deed in an attempt to secure title, and Brockenborrugh reimbursed half of the claimed cost to buy the property. When that failed, McLeod, Brockenborrugh, and others sought to fraudulently obtain the property from Robinson and the other Roy heirs. The participants all worked toward a common goal, and although Brockenborrugh may not have participated in every step of the conspiracy, it is clear that he was significantly involved from start to finish. Accordingly, we hold that the evidence establishes a single conspiracy. The district court did not err in refusing to give the jury Brockenborrugh’s requested instruction.
IV.
Brockenborrugh also appeals from his sentence, arguing the district court made three clearly erroneous factual findings in calculating his sentencing range. When applying the clear error standard of review, we are mindful that the trial judge *738 has a unique opportunity “to evaluate the credibility of witnesses and to weigh the evidence.” Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 855, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982); see also Harry T. Edwards & Linda A. Elliot, Federal Courts Standards of Review: Appellate Court Review of District Court Decisions and Agency Actions 21 (2007) (explaining clearly erroneous standard). Accordingly, we affirm unless we are “left with the definite and firm conviction that a mistake has been committed.” United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).
We begin with Brockenborrugh’s argument that the district court did not properly calculate the monetary loss associated with his offense. Under section 2B1.1 of the Guidelines, a defendant’s offense level depends in part on the loss— actual or intended — for which he is responsible. See U.S.S.G. § 2Bl.l(b)(l) & cmt. n. 3 (A). Of course, Brockenborrugh caused no actual loss because the scheme was ultimately unsuccessful. But the district court found that the conspirators planned to sell the property to Silbert for $300,000. Under section 2B1.1, that amount of intended loss required a twelve-level increase to Broekenborrugh’s base offense level. Brockenborrugh does not object to the $300,000 figure as a “starting point,” see Reply Br. of Appellant at 7, but argues it should have been discounted by the $165,000 he and his co-conspirators agreed to pay the Roy heirs in their second attempt to obtain the property. According to Brockenborrugh, the amount of loss is at most $135,000, which calls for a ten rather than a twelve-level increase.
The district court’s loss calculation is a factual finding that we review for clear error. United States v. Leonzo, 50 F.3d 1086, 1088 (D.C.Cir.1995).[2] Brockenborrugh’s argument is flawed because it overlooks the effort to obtain the property using the fraudulent deed. Had Brockenborrugh and McLeod succeeded, the conspirators would have sold the property for $300,000 without any involvement by its rightful owners. It was only after this first attempt failed that Brockenborrugh and McLeod agreed to pay any money to the Roy heirs. Brockenborrugh fails to account for this first attempt because he argues there is no evidence “linking him to McLeod’s fraudulent deed scheme,” Reply Br. of Appellant at 8. But as we have explained, this is simply not true. Accordingly, there is no reason for deducting any amount from the $300,000 of intended loss.
Brockenborrugh next argues that the district court erred by enhancing his sentence for abuse of a position of trust. Section 3B1.3 of the Guidelines provides that if a defendant holds himself out to his victim as occupying a position of public trust in a way that significantly facilitates the commission of the offense, his sentence may be increased by two levels. U.S.S.G. § 3B1.3 & cmt. n. 3. The district court determined that there was “absolutely no *739 question ... that [Brockenborrugh] acted so as to create the impression in the minds of a number of individuals that he was a United States Marshal.” Trial Tr. 23 (Feb. 14, 2008). Brockenborrugh disputes this finding, arguing that he never held himself out as a U.S. Marshal and that, even if he did, he did not use his representations to facilitate an offense.
Because this challenge calls into question findings of fact, we again review for clear error. See 18 U.S.C. § 3742(e) (2006); see also United States v. Henry, 557 F.3d 642, 644-45 (D.C.Cir.2009). There is evidence that Brockenborrugh held himself out as a U.S. Marshal. For example, Brockenborrugh told Robinson that one of the property’s squatters, seeing him at the courthouse, said, “[0]h you’re a real marshal.” App. at 105. Brockenborrugh did not correct him, but instead adopted the characterization and stated that the squatter had not previously believed that he held such a position. See id. at 106. During that same conversation, when the conspirators presented Robinson with a contract to buy the property, she requested additional information about the buyers but told Brockenborrugh that she already knew about “Mr. U.S. Marshall [sic].” Id. at 136-37. Again, Brockenborrugh made no effort to correct her mistaken impression.
There is also evidence that Brockenborrugh used these misrepresentations to facilitate the offense. The scheme required convincing Robinson that the property was worth little or nothing and that her only realistic option was to sell it to the conspirators for a price she would not realize was well below its true value. Brockenborrugh used his fictitious status as a U.S. Marshal toward this end. For example, after telling Robinson that the squatter recognized him as a “real marshal,” Brockenborrugh claimed that the only reason the squatters had not reentered the property was his continuing involvement in its purchase. And, as noted, Robinson did not press for additional information about Brockenborrugh because she believed him to be a U.S. Marshal. Thus the district court did not clearly err in concluding that Brockenborrugh presented himself as a U.S. Marshal and used that representation to facilitate his offense.
Finally, Brockenborrugh argues that the district court erred in increasing his offense level for obstruction of justice. Section 3C1.1 of the Sentencing Guidelines provides:
If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to ... the defendant’s offense of conviction and any relevant conduct[,] increase the offense level by 2 levels.
The commentary to this guideline provides a nonexhaustive list of conduct that may constitute obstruction of justice, including perjury, destroying or concealing material evidence, and providing a materially false statement to law enforcement to significantly obstruct an official investigation. See id. § 3C1.1, cmt. n. 4. The commentary makes clear, moreover, that “the conduct to which th[e] adjustment applies is not subject to precise definition.” Id. § 3C1.1, cmt. n. 3.
The district court applied this adjustment because Brockenborrugh lied on the stand, finding that “[h]e very obviously denied his extremely close, not to say intimate relationship with, Ms. McLeod,” “falsely denied that he evicted the tenants,” and “denied that he threatened Ms. Robinson ... that he could influence the police to withdraw their extra attention and protection for the property.” Trial *740 Tr. 24-25 (Feb. 14, 2008). Brockenborrugh does not dispute that lying on the stand is grounds for applying this adjustment. Instead he claims that his testimony was truthful, which is another challenge to the district court’s factual findings that we review for clear error, 18 U.S.C. § 3742(e).
Brockenborrugh’s testimony about his ability to influence the police to protect the property provides ample support for the district court’s decision that he lied. During the first group meeting, Brockenborrugh threatened to have the police stop paying extra attention to the property, which meant, in effect, that the police would leave the property without protection from squatters. He told Robinson his group’s involvement in the sale was “the only reason why the police [we]re doing anything” to keep the squatters out of the building. App. at 143 (wire transcript). Although acknowledging that the police had a general duty to protect all property, Brockenborrugh cynically added, “[Y]ou know how police are,” implying that without his participation the police would do nothing at all to protect this property. Id.-, see also id. at 143^14. At trial, Brockenborrugh admitted he threatened that extra police attention would cease were Robinson to stop dealing with his group. He denied, however, threatening that police protection would cease altogether. He stated that he merely meant the police “wouldn’t be going by there on [his] behalf. [It] is their job to go by there and check on that property, or any property.” Trial Tr. 187 (Oct. 25, 2007); see also id. at 187-88 (“Q: [Y]ou meant to suggest to Ms. Robinson that if you pulled out of the deal, ... the police ... will go away, right? A: I didn’t mean that they would go away just because I was out of the deal”).
The district court concluded that Brockenborrugh lied at trial about what he said to Robinson regarding the level of protection the police would give the property. In a spare explanation, the district court said only that Brockenborrugh lied about his threat to withdraw the police’s “extra attention and protection for the property.” Trial Tr. 25 (Feb. 14, 2008). We read this explanation as referring not only to Brockenborrugh’s threat to remove extra attention but also to his threat to remove all protection from the property. Because Brockenborrugh’s testimony about this latter threat was untruthful, we conclude that the district court did not clearly err in deciding that Brockenborrugh’s trial testimony contradicted what he had told Robinson and warranted an enhancement for obstruction of justice.
Our dissenting colleague argues that the district court did not base its finding of obstruction of justice on Brockenborrugh’s lie at trial about his threat to withdraw all police protection from the property. Rather, according to her reading, the district court mistakenly relied on a nonexistent contradiction in what Brockenborrugh said about withdrawal of extra police attention for the property. Were we to read the district court’s explanation as referencing only the withdrawal of extra police attention, we would agree with the dissent. Brockenborrugh admitted at trial that he threatened to withdraw the extra police attention. But given the evidence presented at trial and the “crystal clear” discrepancy between Brockenborrugh’s testimony and his recorded statements, Trial Tr. 25 (Feb. 14, 2008), it is apparent that the district court based its conclusion on a finding that Brockenborrugh lied at trial when he denied having made a threat to withdraw even minimal police protection for Robinson’s property. This reading of the district court’s explanation is bolstered by the fact that the government argued in its sentencing memorandum for an enhancement not because Brockenborrugh *741 lied about the extra police attention, but because he lied about “threaten[ing] Ms. Robinson that he could cause the withdrawal of police attention to her property” altogether. Government’s Mem. in Aid of Sentencing at 7. The district court enhanced Brockenborrugh’s sentence at the government’s request, which strongly suggests that it relied on the lie the government identified about the threatened withdrawal of all police protection.
We reject the dissent’s suggestion that we reach this conclusion through impermissible appellate factfinding. See Dissenting Op. at 745 (“[F]actfinding is the basic responsibility of district courts, rather than appellate courts, and ... the Court of Appeals should not ... resolve[ ] in the first instance [a] factual dispute which had not been considered by the District Court.” (quoting In re Sealed Case, 552 F.3d 841, 845 (D.C.Cir.2009) (alterations in original))). To the contrary, we have explained why the district court’s factfinding and conclusion are not clearly erroneous. We have found no facts and have in no way usurped the district court’s factfinding function. We have, instead, respected it, and merely described the relevant context to show the district court’s decision is best understood as increasing Brockenborrugh’s sentence because he lied at trial about his threat to withdraw police protection from the property. The dissent, reading the district court’s explanation in a parsed manner that overlooks its meaning in context, simply disagrees that this conclusion correctly conveys what the district court had in mind.
The district court’s decision is independently supported by Brockenborrugh’s lie in his testimony about his relationship with McLeod. Viewing the testimony on this subject in the light most favorable to Brockenborrugh, the district court could have concluded that Brockenborrugh testified truthfully about the relationship; he did not deny its existence and the first time he was asked about the sexual nature of the relationship on cross-examination, he answered honestly. But it is also reasonable to conclude that he lied about the relationship. Brockenborrugh was on notice that his relationship with McLeod was relevant because he put the relationship at issue. His central defense, after all, was that he was an innocent investor deceived by McLeod, his realtor, to join unwittingly in an unlawful business transaction. And before Brockenborrugh took the stand, the district court heard argument between counsel in Brockenborrugh’s presence on whether he could be cross-examined about his sexual relationship with McLeod. It is fair to infer that Brockenborrugh was intentionally concealing the true nature of his relationship when he testified that his prior description, which made no mention of the romance, was complete.[3] ‘Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be clearly erroneous.” Anderson v. Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
Our dissenting colleague states that a more searching form of clear error review applies because this case does not require us to “review[] factual findings based on assessments of the credibility of a witness.” Dissenting Op. at 743. Yet that is *742 exactly what we are called upon to do. Cf. Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499-501, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (“The same ‘clearly erroneous’ standard applies to findings based on documentary evidence as to those based entirely on oral testimony, but the presumption has lesser force in the former situation than in the latter.” (citations omitted)). Upon viewing Brockenborrugh’s demeanor on the witness stand and hearing all of the evidence presented at trial, the district court determined that Brockenborrugh lied about his sexual relationship with McLeod. On clear error review, appellate judges should not comb through the record seeking to identify the best factual inferences to draw from the transcript of a witness’s testimony. “The trial judge’s major role is the determination of fact, and with experience in fulfilling that role comes expertise.” Bessemer City, 470 U.S. at 574, 105 S.Ct. 1504. We must defer to the considered judgment of the trial judge. Doing so, we hold that the district court did not clearly err in finding Brockenborrugh lied on the stand.
V.
For the foregoing reasons, the judgment of the district court is

Affirmed.

. When a party forfeits a challenge by failing to raise it below, the general rule is that plain error review applies. See Fed.R.Crim.P. 52(b). The plain error standard of review imposes a more substantial burden on criminal defendants than does clear error review, and is intended to ensure that forfeited-but-obvious errors do not effect a miscarriage of justice.

. The government argues, and Brockenborrugh seems to agree, that Brockenborrugh’s challenges to the district court's factual findings are subject to plain error review under United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), because they were not raised before the district court. See Br. of Appellee at 51. Our case law on this issue is not settled, and two members of this court have recently expressed the view in a concurring statement that we must apply a clear error standard of review to factual findings made at the time of sentencing regardless of whether the defendant objected to those findings below. See In re Sealed Case, 552 F.3d 841, 848-52 (D.C.Cir.2009) (Edwards; J., concurring, joined by Silberman, J.). Because we find no clear error — much less plain error — in the district court's factual findings, we affirm without taking up this question.

. The dissent makes much of the fact that Brockenborrugh was merely asked to describe "basically” his relationship with McLeod. See Trial Tr. 68-69 (Oct. 25, 2007); see also Dissenting Op. at 747-49. But Brockenborrugh and McLeod's two-and-a-half-year affair was a "basic” element of their relationship, and it seems reasonable that he would have mentioned it as such despite his view that he was not McLeod's “boyfriend or anything," Trial Tr. 134 (Oct. 25, 2007).